Filed 12/22/15  P. v. Williams CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B255379 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA075334) |
| v. | |
| LANCE ELLIOT WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Affirmed as modified.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Lance Elliot Williams was convicted of making a criminal threat, stalking and several related offenses after Sumaiya Islam, a model who had entered into a talent management contract with him, refused to pose nude and attempted to rescind the contract. Williams contends the trial court did not sufficiently advise him of the risks of self-representation, erred in admitting evidence that he had previously harassed another young woman under similar circumstances and erred in failing to grant a continuance before sentencing so Williams could undergo psychiatric evaluation.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

Williams was charged by information with one count each of making a criminal threat (Pen. Code, § 422, subd. (a)),[2] attempted extortion (§ 524), dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)) and stalking (§ 646.9 subd. (a)). The information specially alleged Williams had suffered a prior serious felony conviction within the meaning of section 667, subdivision (a), and the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and had served a prior separate prison term for a felony (§ 667.5, subd. (b)). Williams pleaded not guilty and denied the special allegations.

2. *Summary of the Evidence Presented at Trial*

   a. *The People's case*

      i. The modeling contract

Islam testified Williams offered her a job modeling in a music video when they met at a coffeehouse in July 2013. She was 23 years old. Williams gave Islam his

---

[1]     Pursuant to *People v. Mooc* (2001) 26 Cal.4th 1216, Williams has requested we examine the transcript of the in camera hearing conducted by the trial court after the court determined Williams had demonstrated good cause to discover information in Los Angeles Police Detective Timo Illig's personnel and administrative records pertaining to allegations of dishonesty or false reporting. (See Evid. Code, §§ 1043, 1045; *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.) We have examined the sealed transcript of the in camera proceedings and conclude the trial court satisfied the minimum requirements in determining there was no discoverable material. No abuse of discretion occurred. (See *Mooc*, at p. 1225.)

[2]     Statutory references are to this code unless otherwise indicated.

telephone number, and Islam added it to her cellphone under the contact name "Lance Williams."

On August 3 and 4, 2013 Islam worked as an extra in a two-day music video shoot. On the first day Williams presented her with a single-page contract entitled "Williams Talent Management." Islam, who signed the contract, understood the contract was nonexclusive; Williams was to receive 20 percent of any payment Islam earned under his management. Islam and Williams never discussed nude modeling. Islam earned $50 for the video shoot. Williams told her not to worry about paying him his commission, which was only $10.

A few weeks later Williams presented Islam with a second contract requiring her to do a nude test shoot. Islam told him she would "not, in no way, shape, or form, do[] anything nude." On August 19, 2013 Williams sent Islam a text message asking if she was going to do the shoot.[3] She reiterated she would not pose nude under any circumstances. Williams responded they could still be friends; "[n]o hard feelings i still love ya." Islam then requested Williams release her from the first contract. Williams refused, stating he was entitled to commission on any work she obtained through his connections. Islam asked Williams to delete her phone number.

ii. The threatening text messages

On August 22, 2013 Williams sent Islam a text message asking her to pay for her headshots and the 20 percent commission from the music video shoot. Islam responded to Williams, also via text message, to stop contacting her or she would call the police. Williams responded, "Ha ha ha u mention my name and cops instagram snitch youll need more then them to carry you fuck around see you at court. BITCH!" Islam interpreted this message to mean she would need more than police assistance to protect her if she reported Williams to the authorities. After Islam again told Williams to stay away, he responded, "If u dont give me my 10 dollars i make hannibal lector look like a bitch wire

---

[3]     Screen shots of text messages between Islam and Williams from August 18, 2013 through September 10, 2013 were admitted into evidence.

3

it asap." Islam felt threatened by Williams's reference to the fictional cannibalistic serial killer. Islam told Williams she was going to call the police if he texted her again. Williams responded: "U know wat it is bitch see u at court your threats arent funny to my goons fuck around." Islam testified she interpreted "goons" to mean gang members.

On September 4, 2013, in response to another text message from Williams, Islam offered to pay his $10 commission if he was willing to meet her at the police station. Williams declined and told her he was going to sue her for breach of contract. On September 9, 2013 Williams demanded Islam wire him $100. Islam again told Williams she would deliver his $10 commission at the police station. Williams replied, "U owe lawyer fees so you pay 100 or 5000 choose[.] [A] bunch of gangmembers lookin to serve those papers," and "U dont even know wat a threat is bitch[.] [L]earn your penal codes and watch who u play wit."

On September 10, 2013 Islam was outside her house with friends when she noticed a car drive by slowly, make a U-turn, and then drive by again. She could not see who was in the car, but she went inside because she was concerned. When she got inside, she received another threatening text message from Williams, which included a reference to one of Islam's friends who had spoken to Williams in an attempt to resolve the problem. After this incident Islam reported Williams to the police.

iii. Bertha Esquivel's testimony

Over Williams's objection, 22-year-old Bertha Esquivel testified she was in a big-box store parking lot when Williams approached her in December 2011 and asked if she would be interested in modeling.[4] Williams told Esquivel the jobs would consist mainly of head shots. Three days later they met at a coffeehouse and Williams gave Esquivel a

---

[4]    In opposition to the People's pretrial motion to allow Esquivel's testimony under Evidence Code section 1101, subdivision (b), Williams argued he had never met Esquivel, Esquivel did not identify Williams in a lineup, and she did not say she was threatened or that Williams had tried to extort money from her. The trial court found Esquivel's testimony was admissible as evidence of intent and a common plan or scheme, and explained Williams's argument went to the strength of the evidence, not its admissibility.

contract.  After Esquivel signed the contract, Williams called her to arrange a test photo shoot.  He directed Esquivel to meet him outside his apartment and to bring a bathing suit.  Esquivel told Williams she thought they had agreed she would not pose in a bathing suit.  In reply Williams said she did not need to bring a bathing suit, but asked that she meet him at his apartment without her mother.  Esquivel nevertheless brought her mother with her because she did not feel safe.  As Esquivel and her mother followed Williams's car to the photo shoot, he called Esquivel and angrily asked why she had brought her mother.  Esquivel told Williams to find another girl, and she drove home.

Williams subsequently called Esquivel about 15 times a day.  She answered two of the calls.  Williams said he was going to sue Esquivel for breach of contract for $2,000 to $4,000.  After she stopped answering the telephone, Williams began texting her.  Williams called her a "weird, stupid bitch . . . just like the other ho's."  After Esquivel warned him she was going to file a police report, Williams responded, "I dare you to.  I know where you live."  "I know exactly what I'm going to do to you."  Esquivel testified she felt threatened and even considered moving because Williams knew where she lived.  Esquivel went to the police on January 5, 2012.  The police called Williams at the telephone number he had given Esquivel and left a voicemail telling him to leave Esquivel alone.  Esquivel never heard from Williams again.

b.  *The defense case*

Williams's principal defense theory was that he had not sent the threatening text messages, insisting he had not been in possession of the phone when they were sent.  Williams, representing himself, testified in narrative fashion.  He called as witnesses his mother, Patricia Jenkins, and his friend, Michael Robertson, who testified they had the phone when certain of the text messages were sent to Islam.  Among other witnesses Williams also presented an expert on cellular telephones and GPS data recovery.

i.  Williams's testimony

Williams testified he was the face of Williams Talent Agency and ran the everyday business of the company, but he was not its owner.  He was in the parking lot in July 2013 when two of his friends met Islam in the coffeehouse and brought her out to

5

meet him. They exchanged telephone numbers. Williams subsequently arranged for Islam to appear in the music video. After the shoot, Williams's assistant, Pauline Flores, learned about a job requiring a nude test photo shoot. On August 19, 2013, while Williams was in the car with Flores, Flores texted Islam about it. Islam became angry and asked to be let out of her contract.

Williams denied sending any of the text messages to Islam, claiming all the messages were sent by Flores, his mother, and Williams Talent Agency employees Michael Robertson and Prince Bertz. According to Williams, Robertson obtained the phone from which the text messages had been sent on August 20, 2013.

Williams also denied meeting Esquivel. He stated he was in jail when Esquivel claimed to have met him. He believed another company employee named Shaun, who had used contracts with Williams's name on them to conduct income tax schemes, met with Esquivel.

### ii. Robertson's testimony

Robertson testified there were a number of company cell phones that were "bounce[d] around between several people" within Williams Talent Agency. Robertson had the cell phone that was used to send messages to Islam between August 20, 2013 and August 26, 2013 When Robertson first received the phone, Williams called him on his personal number and told him there might be someone on the company phone who would be "talking smack." On August 22, 2013 Robertson was driving while his friend Pea Bone was texting Islam;[5] it was Pea Bone who sent the Hannibal Lector text message. Robertson stated Pea Bone was aware of the contract with Islam and had asked her to pay $10 (the amount Williams originally wanted from Islam) so he could purchase marijuana. Robertson claimed he left the phone at friends' houses and in their cars and suggested they may have used the phone for Internet and texting during that time.

---

[5]     Williams testified he did not know Pea Bone.

### iii. Jenkins's testimony

Jenkins testified she had the cell phone on August 16, 2013 and again beginning in the afternoon of September 4, 2013 through September 9, 2013. According to Jenkins, she was not a company employee, but needed a phone because hers had been shut off. According to Jenkins, Flores had the phone on September 10, 2013. Jenkins testified she did not personally send any of the text messages to Islam.

### 3. *The Verdict and Sentence*

The jury found Williams guilty of attempted extortion, dissuading a witness from reporting a crime and stalking and not guilty of making a criminal threat. In a bifurcated trial the jury found true the prior conviction allegations. The trial court sentenced Williams to an aggregate state prison term of 13 years eight months.

## DISCUSSION

### 1. *The Trial Court Did Not Err in Granting Williams's Request for Self-representation*

#### a. *Governing law*

A criminal defendant is entitled under the Sixth and Fourteenth Amendments to waive his right to counsel and to represent himself. (*Faretta v. California* (1975) 422 U.S. 806, 819 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*) ["[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense"].) "'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. At the same time, . . . because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself.'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069.)

If the defendant is mentally competent and, within a reasonable time before trial, makes an unequivocal request knowingly and voluntarily after having been advised by the court of the dangers of self-representation, the request for self-representation must be granted. (*Faretta*, *supra*, 422 U.S. at p. 835; *People v. Valdez* (2004) 32 Cal.4th 73, 97-

7

98; *People v. Welch* (1999) 20 Cal.4th 701, 729.)  "'No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation.' [Citation.]  Rather, 'the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case.'" (*People v. Blair* (2005) 36 Cal.4th 686, 708; see *People v. Trujillo* (2015) 60 Cal.4th 850, 859-860 ["*Faretta* requires advisements prior to a defendant's knowing and intelligent waiver of the right to counsel 'so that the record will establish that "he knows what he is doing and his choice is made with eyes open"'"].)

The burden is on the defendant who seeks to waive counsel to show that he did not intelligently or knowingly waive his right to counsel; this burden is not satisfied by simply pointing out that certain advisements were not given.  (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1058-1059; *People v. Truman* (1992) 6 Cal.App.4th 1816, 1824.) On appeal the reviewing court independently examines the entire record to determine if the defendant knowingly and intelligently waived his or her right to counsel.  (*People v. Burgener* (2009) 46 Cal.4th 231, 241; *People v. Koontz, supra,* 27 Cal.4th at p. 1070.)

b. *Williams's initial waiver of his right to counsel and subsequent affirmations he wanted to represent himself*

On October 1, 2013 Williams first asserted his right to self-representation.  At that time Williams completed and signed an "Advisement and Waiver of Right to Counsel (Faretta Waiver)," which included sections advising Williams of the dangers and disadvantages of self-representation and recommended Williams not act as his own attorney.[6]  In completing the form, Williams left blank the space to identify the high

---

[6]     For example, under the section entitled "Dangers and Disadvantages of Representation" Williams was required to initial the clause "I understand that if I am permitted to represent myself it will be necessary for me, WITHOUT THE ASSISTANCE OF A LAWYER OR THE COURT, to follow all the technical rules of substantive law, criminal procedure, and evidence."  He also had to initial the clause "I understand and cannot and will not receive any help or special treatment from the court."

school he had attended. He also failed to list all of the crimes charged in response to question 4.

At the preliminary hearing, held on October 1, 2013, the trial court asked Williams if he had a high school diploma and if he had talked to the lawyer assigned to his case. In response Williams stated he had graduated from high school and had talked to the lawyer, but felt as though the lawyer did not have his best interests at heart. The court advised Williams the attorney appointed to represent him was "a very thorough, well-trained, experienced attorney . . . [a]nd he's got a law degree, which you don't have, right?" Williams stated he still wished to represent himself. The court then asked Williams if he understood the charges against him, to which Williams stated he understood and, if he did not, he would research the charges in the law library. Before granting his request, the court expressly advised Williams it did not believe it was in his best interest to represent himself.

At the October 17, 2013 arraignment hearing, the court (a different judge from the preliminary hearing) asked Williams if he still wished to remain self-represented. The court stated, "Mr. Williams, I need to advise you that you have an absolute right to have counsel appointed for you if you cannot afford your own or you can have private counsel come in if you can afford your own. Do you understand those rights, give them up and still wish to remain self-represented?" Williams responded, "Yes."

At a pretrial hearing on December 9, 2013 the court (a third judge) appointed attorney Susan Brown as standby counsel. Before doing so, the court advised Williams, "[S]tandby counsel doesn't mean cocounsel. So you're still representing yourself. . . . If you want her to represent you, if that's something you are considering, I can do that. I can actually appoint her, if you want. But it's up to you. Now, let me just make clear. As you know, you have the absolute right to represent yourself. And you've been doing that. You know what the negatives are, especially when you are in custody and you don't have someone outside working for you, especially when you don't have someone who is knowledgeable about the law and a trained lawyer and an experienced lawyer working for you. So you know all about what the negatives are. I'll leave it to you." Williams

9

indicated he understood standby counsel was not cocounsel and once again elected to remain self-represented.

### c. *The trial court adequately advised Williams of the risks of self-representation*

Williams contends he was not properly advised of the risks of self-representation because the trial court did not confirm that he had actually read the *Faretta* waiver form or that he understood it. Williams's insistence on a specific set of questions and advisements to confirm a defendant's knowing waiver of his or her right to counsel is unwarranted. (See *People v. Blair*, *supra,* 36 Cal.4th at p. 709.) "The court might query the defendant orally about his responses on the [*Faretta*] form, to create a clear record of the defendant's knowing and voluntary waiver of counsel. [Citation.] The failure to do so, however, does not necessarily invalidate defendant's waiver, particularly when . . . we have no indication that defendant failed to understand what he was reading and signing." (*Ibid.*; accord, *People v. Miranda* (2015) 236 Cal.App.4th 978, 988.) The trial court, at the preliminary hearing, focused its questioning on specific sections of the *Faretta* waiver form Williams had not completed. By doing so, the court made sure Williams had answered all the questions on the form and, inferentially, that he understood the significance of his decision, as set forth in that comprehensive document. Moreover, Williams's responses to the questions on the *Faretta* waiver form, and to the court, the numerous filings he submitted, and his confirmation he had graduated from a high school all indicate he could understand what he had read and what was being asked of him; nothing in the record, on the other hand, suggests Williams did not possess the level of literacy and intelligence necessary to understand what he was signing.

Williams also contends the trial court erred because it did not orally warn him about the specific limitations and challenges he would face if he represented himself. No such oral advisement is necessary unless it appears the defendant did not understand the written warnings. (See *People v. Blair*, *supra*, 36 Cal.4th at 708.) As discussed, nothing in the record suggests Williams did not read and understand the *Faretta* waiver form, which identified 13 specific disadvantages to self-representation, each of which Williams

initialed.  Moreover, before granting his request, the court orally warned Williams it did not believe it was in his best interest to represent himself.  Between the written waiver form and the trial court's oral warning, Williams was sufficiently advised of the dangers of self-representation before the trial court granted his self-representation request.  He made his decision with eyes open.

Not only was Williams adequately advised when he initially requested to represent himself but he was also repeatedly warned of the dangers of self-representation after his request had been granted.  At the December 2013 pretrial hearing, the court reminded Williams of the negative aspects of representing himself and told Williams he would appoint counsel for him if Williams requested it.  At that point, Williams had been representing himself for many weeks and certainly knew the limitations associated with self-representation; yet he again declined the opportunity to withdraw his request.

2. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Williams's Prior Interaction with Esquivel*

a. *General principles governing evidence of uncharged misconduct*

California law has long precluded use of evidence of a person's character (a predisposition or propensity to engage a particular type of behavior) as a basis for an inference that he or she acted in conformity with that character on a particular occasion: Evidence Code section 1101, subdivision (a),[7] "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).)  Indeed, "'[t]he rule excluding evidence of criminal propensity is nearly three centuries old in the common law.'" (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 (*Falsetta*).)

---

[7]      Evidence Code section 1101, subdivision (a), provides, "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Evidence Code section 1101, subdivision (b),[8] clarifies, however, that this rule "does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393; accord, *People v. Leon* (2015) 61 Cal.4th 569, 597-598 (*Leon*); see *Falsetta*, *supra*, 21 Cal.4th at p. 914 ["the rule against admitting evidence of the defendant's other bad acts to prove his present conduct [is] subject to far-ranging exceptions," citing Evid. Code, § 1101, subd. (b)].) "'[E]vidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes [citation] . . . only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent.'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1147; accord *People v. Edwards* (2013) 57 Cal.4th 658, 711.)

The least degree of similarity between the uncharged act and the charged offense is required to prove intent. (*Ewoldt, supra,* 7 Cal.4th at p. 402.) "A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' . . . [¶] To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at pp. 402-403.)

---

[8] Evidence Code section 1101, subdivision (b), provides, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Even if evidence of uncharged crimes is relevant under Evidence Code section 1101, subdivision (b), before admitting the evidence a trial court must also find it has substantial probative value that is not largely outweighed by its potential for undue prejudice under Evidence Code section 352. (*People v. Leon*, *supra,* 61 Cal.4th at p. 599; *People v. Kipp* (1998) 18 Cal.4th 349, 371.) A trial court should not exclude highly probative evidence unless the undue prejudice is unusually great. (*People v. Walker* (2006) 139 Cal.App.4th 782, 806; *People v. Sassounian* (1986) 182 Cal.App.3d 361, 402.)

The trial court's determination of the admissibility of evidence of uncharged offenses is reviewed for abuse of discretion. (*People v. Kipp*, *supra,* 18 Cal.4th at p. 369 ["[o]n appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion"].) Similarly, whether the probative value is outweighed by the prejudicial effect of the evidence is subject to abuse-of-discretion review. (*People v. Leon*, *supra*, 61 Cal.4th at p. 599; *People v. Davis* (2009) 46 Cal.4th 539, 602.)

### b. *The incident with Esquivel was admissible to prove common plan and intent*

Williams contends evidence of the incident with Esquival was not admissible because his conduct with Esquivel was not sufficiently similar to the charged offense to establish a common plan or scheme. He argues Esquivel never informed the police he demanded money from her and "[e]vidence was not presented that [Williams] attempted to threaten Esquivel to get money or that he repeatedly stalked or harassed her."[9] Notwithstanding Esquivel's failure to report to the police that Williams had threatened to

---

[9]     The People argue Williams has forfeited this argument because he did not properly object at trial. Although Williams's objection in the trial court was not as well defined as his presentation on appeal, he did argue Esquivel did not say she was threatened or that Williams had tried to extort money from her, thus challenging whether the prior conduct was sufficiently similar to the charged offenses to warrant admission of Esquivel's testimony.

13

sue her for several thousand dollars,[10] Williams's interactions with Esquivel were sufficiently similar to the charged offenses to prove the existence of a common plan or scheme. In both instances Williams approached women in their early twenties to discuss potential modeling jobs and gave them the same telephone number. After they had signed contracts containing similar terms, Williams tried to get them to pose with little or no clothing. When they refused, Williams sent text messages threatening to sue them for breach of contract and to harm them if they went to the police. Additionally, only 18 months had passed between the uncharged act and the charged offense, militating in favor of admitting the evidence. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211 [although principle factor for admitting an uncharged act is the similarity between the charged conduct and the uncharged act, the amount of time between the uncharged act and charged act is also important].) Esquivel's failure to inform the police of the details of Williams's misconduct was an appropriate subject for cross-examination; but it did not preclude her testimony that Williams had threatened her and demanded money, as he had Islam.

Williams also contends the trial court erred in admitting the evidence to prove intent because his defense was simply that he had not sent the text messages. Contrary to Williams's position on appeal that the text messages "speak for themselves," however, before jury selection Williams indicated he would introduce records of his mental health history and call as a witness an individual identified as his psychiatrist because "this case regards specific intent." Regardless of Williams's theory of defense, moreover, the People were required to prove specific intent as elements of the charged offenses of making a criminal threat (§ 422; see *People v. Velazquez* (2011) 201 Cal.App.4th 219, 229), dissuading a witness (§ 136, subd. (b)(1); see *Velazquez*, at p. 230), and stalking (§ 646.9, subd. (a); see *People v. Gams* (1977) 52 Cal.App.4th 147, 152, fn. 4.). "A not guilty plea puts at issue all elements of the charged offense. [Citations.] There is no

---

[10] Esquivel explained she did not report Williams's demand for money because "I was making a report because you were harassing me. I didn't give them full details. I was just concerned about you threatening me."

14

requirement that a defendant dispute the element of intent before a prosecutor may introduce relevant evidence on the issue. [Citation.] Thus, the "'prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.'"'" (*People v. Escudero* (2010) 183 Cal.App.4th 302, 313.) Because the acts were sufficiently similar to warrant admission of the incident with Esquivel as evidence of common plan or design, they were necessarily admissible on the issue of intent. (See *Ewoldt*, *supra,* 7 Cal.4th at p. 402 [the least degree of similarity is required to prove intent].)

Finally, the trial court did not abuse its broad discretion in determining the evidence was more probative than prejudicial. "The prejudice which exclusion of Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Here, the prejudice to Williams resulted from its persuasiveness, not from the possibility the evidence could be misconstrued or evoke an emotional bias against Williams.

3. *The Trial Court Did Not Abuse Its Discretion in Refusing To Continue the Sentencing Hearing for Williams To Undergo a Psychiatric Evaluation*

On February 6, 2014 the court granted Williams a one-month continuance of the sentencing hearing to prepare a motion for new trial, rejecting his request for a two-month continuance he claimed was necessary because he had a bad memory and needed transcripts of the trial proceedings before he could draft his motion. (The court indicated it did not believe Williams's assertion he could not recall what had occurred at trial.) On March 7, 2014 Williams filed a motion requesting a psychiatric evaluation for mitigation purposes at the sentencing hearing. On March 18, 2014 he filed a second motion requesting a psychiatric examination, asserting he believed he had been incompetent

during portions of the pretrial and trial proceedings. The court denied both motions, explaining the authority Williams had cited did not support his requests and expressing its view Williams was simply attempting to further delay proceedings. At the sentencing hearing on March 18, 2014 Williams stated he had mailed to the court another motion for a continuance because he was still preparing his new trial motion. The trial court responded it had not received the motion, but would deny it in any event because Williams had been given enough time to prepare. Williams then argued he required a continuance because he had been in psychiatric wards for the week leading up to the sentencing hearing and, as a result, did not have access to a phone or his paperwork. The court rejected this argument after inquiring from sheriff's deputies and learning Williams had been confined for only two days and returned to normal confinement, with full access to the law library and telephone, for six days prior to the hearing. (His confinement was apparently triggered by threats of suicide and violence against others that appeared in documents Williams had written.) The court proceeded to sentence Williams to state prison.

The trial court did not abuse its discretion in denying Williams's requests for further continuances of the sentencing hearing. "Continuances shall only be granted upon a showing of good cause." (§ 1050, subd. (e).) A trial court's denial of a motion for continuance is reviewed for abuse of discretion. (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.) "'""There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 287-288.) The party challenging the denial of a continuance bears the burden of proving the court abused its discretion in denying the motion. (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

Nothing in the record supports Williams's request for a continuance to permit a psychiatric evaluation. To the contrary, the trial court reasonably concluded Williams was attempting to further delay the proceedings, particularly since the court had

16

previously granted Williams only half the time he had sought to file a new trial motion and prepare for the sentencing hearing. Under these circumstances Williams's two-day stay in the psychiatric ward, given his return to normal housing nearly a week before the sentencing hearing, did not compel the court to grant a continuance.

Further, Williams had not been diligent in gathering evidence to support his claimed need for a psychiatric evaluation. (See *People v. Pride* (1992) 3 Cal.4th 195, 254 [proper for the trial court to deny defendant's motion for a continuance prior to the sentencing hearing to explore mental health issues when defendant had "ample opportunity" to do so earlier].) Williams supposedly had evidence of his mental history before jury selection on January 10, 2014. After the sentencing hearing was originally set for February 6, 2014, the trial court granted Williams a continuance until March 14, 2014. There was ample opportunity for Williams to gather evidence for a psychiatric evaluation before the continued hearing date. His failure to do so and the lack of any explanation for the absence of such a request earlier in the proceedings fully support the court's conclusion Williams was only attempting to further delay proceedings. (*Ibid.*)

Finally, the court could reasonably conclude a continuance would not be useful. It was Williams's burden to show both the materiality of the evidence necessitating a continuance and that such evidence could be obtained within a reasonable amount of time. (*People v. Beeler* (1995) 9 Cal.4th 953, 1003, disapproved on another ground in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) Here, nothing in the record indicated a psychiatric evaluation could be obtained in a reasonable amount of time. Moreover, although evidence of a mental or physical condition is proper for mitigation purposes if it "significantly reduce(s) the [defendant's] culpability for the crime" (Cal. Rules of Court, rule 4.423(b)(2)), Williams failed to demonstrate his purported mental health condition would have any impact on his culpability with respect to the crimes for which he had been convicted. Indeed, the only arguments Williams presented to the court related to his bad memory. Williams failed to disclose any other condition that could be confirmed by a psychiatric evaluation that would reduce his responsibility for his actions toward Islam. The trial court acted well within its discretion in denying the request for a continuance.

4. *Williams Is Entitled to Additional Presentence Custody Credit*

The court sentenced Williams on March 18, 2014. On the same day the court sentenced Williams in a related probation revocation proceeding for an underlying 2012 conviction for violating Health and Safety Code section 11358 (cultivating marijuana). Williams asserts, and the People agree, the trial court miscalculated his presentence custody credits in both matters.[11]

The court awarded Williams 354 days (177 actual days and 177 conduct days) of presentence custody credit. However, Williams was in custody for 182 days between his arrest on September 18, 2013 and sentencing on March 18, 2014. Thus, Williams is entitled to 10 additional days of presentence credit for a total of 364 days (182 actual days and 182 conduct days) in the case at bar. Similarly, Williams is entitled to 10 additional days, for a total award of 544 days of custody credit, in the probation violation proceeding.

## DISPOSITION

The judgment is modified to reflect 10 additional days of presentence credit. In addition, 10 additional days of custody credits should be reflected in the judgment in Williams's probation violation proceeding. As modified, the judgment is affirmed. The trial court is directed to prepare corrected abstracts of judgment and forward them to the Department of Corrections and Rehabilitation.

                                        PERLUSS, P. J.

We concur:

        ZELON, J.                        BECKLOFF, J.[*]

---

[11]    None of the offenses in either case constitutes a violent felony under section 2933.1. Therefore, section 4019 subdivision (f), which awards two days of conduct credit for each two days of actual custody, applies to the calculation of conduct credit in both cases. The Attorney General does not question the propriety of addressing in this appeal the erroneous determination of custody credits in the probation violation proceeding.

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.