Filed 8/17/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>JESSE OROSCO,<br><br>   Defendant and Appellant. | D079723<br><br><br>(Super. Ct. No. FWV21000863) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Cara D. Hutson and Corey G. Lee, Judges.  Reversed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, and Melissa A. Mandel, Kathryn A. Kirschbaum, and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jesse Orosco appeals his conviction for one count of assault on a peace officer by means of force likely to produce great bodily injury.

(Pen. Code, § 245, subd. (c).)[1]  He argues:  (1) there is no substantial evidence that the victim was a peace officer; (2) the trial court erroneously denied his request to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*); (3) the trial court erroneously instructed the jury on the definition of a peace officer and his duties; and (4) the abstract of judgment should be corrected.

We find as a matter of law based on the undisputed evidence that the victim was working as a peace officer at the time of the incident.  We conclude, however, that the trial court violated Orosco's Sixth Amendment rights by denying his *Faretta* request for self-representation based on a finding that he was "unable to sufficiently represent himself."  There is no substantial evidence that Orosco was mentally incompetent to represent himself under the applicable legal standard, i.e., that he "suffers from a severe mental illness to the point where he . . . cannot carry out the basic tasks needed to present the defense without the help of counsel."  (*People v. Johnson* (2012) 53 Cal.4th 519, 530 (*Johnson*).)  Because the error is reversible per se, we must reverse the judgment.  Accordingly, we need not decide the other issues raised.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Assault*

Daniel Chism was a deputy sheriff for San Bernardino County assigned to the transportation division at the West Valley Detention Center in Rancho Cucamonga.  The transportation division is responsible for transporting inmates to and from jail, branch courts, and state facilities.

On the morning of January 8, 2021, Deputy Chism was performing his duties at the West Valley Detention Center, getting inmates ready to go to

---

[1]     Further undesignated statutory references are to the Penal Code.

2

court. Orosco was one of the higher security inmates. While Deputy Chism was changing Orosco's leg shackles, Orosco began yelling down the hallway at another inmate, ignoring Deputy Chism's instructions to stop. Deputy Chism decided to move Orosco down the hallway to a holding cell. He held onto Orosco's shirt to direct him down the hallway. Orosco pulled away, then struck Deputy Chism in the face with his left elbow. Deputy Chism suffered major swelling and a laceration to his temple, requiring three stitches. The entire incident was captured on video and played for the jury at trial.

B. *Pretrial and Trial Proceedings*

On March 1, 2021, Orosco was charged with one count of assault on a peace officer by means of force likely to produce great bodily injury. (§ 245, subd. (c).) The matter was assigned to the Honorable Corey G. Lee for a preliminary hearing on May 17, 2021. This was Orosco's first appearance before Judge Lee.

Immediately before the preliminary hearing, Orosco filled out a preprinted *Faretta* waiver form. The bailiff asked Orosco to read over the form and make sure it was correct, but did not explain anything on the form to him.

Orosco initialed a box stating he had been advised of the penalties and consequences if found guilty. He also initialed boxes stating "[t]hat it is generally not a wise choice to represent myself in a criminal matter," "[t]hat the Court will not give me any special consideration because I am representing myself," "[t]hat I will be opposed by a trained experienced prosecuting attorney," "[t]hat I must comply with all rules of law, criminal procedure and evidence," "[t]hat incompetency of counsel as an issue on appeal is waived," "[t]hat any disruptive behavior on my part may result in

3

the Court terminating my pro per status," and "[t]hat if I cannot afford an attorney I have a right to one appointed at no cost to me."

Another line on the form read, "I ☐ DO ☐ DO NOT request the services of an interpreter at further court hearings."  Orosco initially checked the "DO" box, then crossed it out, initialed his correction, and checked the "DO NOT" box instead.

The form had another line stating, "I have been involved in _____ criminal proceedings in the past and I feel I am capable of representing myself."  Orosco initialed this line, crossed out his initials, then initialed it again.  He did not write anything on the blank line.

Orosco initialed the line stating:  "GIVING UP (WAIVER OF) RIGHT TO ATTORNEY:  I hereby give up (waive) my right to an attorney and I choose to represent myself during all proceedings."

Orosco also initialed a line stating, "I have no difficulties in reading and understanding this form."  Orosco signed under penalty of perjury and dated the form under another line stating, "I understand each of the foregoing statements.  I have initialed each statement as proof thereof."

At the preliminary hearing, defense counsel stated that Orosco was requesting a *Faretta* hearing.  Orosco confirmed that he wanted to represent himself.  The trial court then questioned Orosco about his decision.  The court noted:  "I'll tell you right off the bat, it's not generally wise to represent yourself in a criminal matter.  There's a lot of legal intricacies, and you are going to be treated as though you are aware of them as though you are an attorney.  You are not going to get any special treatment.  So it's generally not wise to do so.  Given that, do you still want to proceed pro per?"  Orosco answered, "Yes, ma'am."

In response to further questioning by the trial court, Orosco confirmed that he understood the penalties and consequences he faced if found guilty. He also confirmed his understanding that he would not be given any special consideration and would be treated just as one of the attorneys; that he would be expected to know the law and comply with the rules of criminal procedure and evidence; that he would be opposed by a trained and experienced attorney; that he would be waiving incompetency of counsel as an appellate issue; that his pro per status could be terminated for disruptive behavior; and that if he could not afford an attorney, he had a right to have one appointed for him at no cost. Orosco answered each of these questions politely by saying, "Yes, ma'am."

The court then questioned Orosco about whether he was requesting the services of an interpreter. Based on its reading of the *Faretta* form, the court said, "Seems like you are not; right?" Orosco initially answered that he was requesting the services of an interpreter. When the court noted that Orosco had not checked the box to request an interpreter, Orosco responded, "Oh, well, I'll check mark it right now. My bad. I apologize off the bat [¶] . . . [¶] I honestly didn't know how to fill it out." The court stated, "if you don't know how to fill this form out, I don't know if I can trust you to represent yourself." The court then asked Orosco what language he needed to have interpreted, and Orosco replied "English." The court noted, "But you speak English. You want somebody to interpret your English into English?" Orosco then immediately clarified that he was not in fact requesting the services of an interpreter—consistent with what he had stated on the *Faretta* form.

Orosco told the court that he was born on February 8, 2001, and had graduated from 12th grade and received a diploma.

The court questioned Orosco about the line of the *Faretta* form stating, "[I] have been involved in, blank, criminal proceedings in the past and [I] feel [I] am capable of representing [myself]." Orosco explained, "I thought that meant that if I was pro per in the past." After the court gave Orosco an opportunity to read it over again, he said, "I read it. I don't understand what it's saying. [¶] . . . [¶] I haven't represented myself before. This is my first time representing myself. So I don't understand what I'm supposed to put, yeah or no, in the blank."

The court then stated: "All right. At this point I'm going to deny your *Faretta* request. Okay. I'm finding that at this point, you are not able to understand even the *Faretta* waiver and what it's asking you. So I don't trust that you can sufficiently represent yourself." The entire *Faretta* hearing is just over five pages of transcript.

In a handwritten order denying the *Faretta* motion, the court ruled as follows: "Denied. Defendant does not seem to understand fully what is contained in the *Faretta* waiver form including whether an interpreter is needed even though he states and appears English-fluent, and what a 'criminal proceeding' means as he seems to be confused about the sentence that contains those words. In totality, it appears defendant is unable to sufficiently represent himself."

The court did not order any psychological or psychiatric examination to assess Orosco's mental competence to represent himself. After the denial of his *Faretta* motion, Orosco was represented by appointed counsel at both his preliminary hearing and trial.

After a two-day jury trial with a single witness (Deputy Chism), the jury convicted Orosco of assault on a peace officer by means of force likely to produce great bodily injury. The court sentenced him to 16 months in prison.

6

I

Orosco first argues that his conviction for assault on a peace officer must be reversed because there is no substantial evidence Deputy Chism was working as a peace officer at the time of the incident.  Because the material facts are undisputed, and the issue raised is one of statutory interpretation, our review is de novo.  (*Kurtz v. Calvo* (1999) 75 Cal.App.4th 191, 193-194.)

Section 830.1, subdivision (a), provides in relevant part:  "A sheriff, undersheriff, *or deputy sheriff*, employed in that capacity, of a county . . . is a peace officer."  (Italics added.)  There is no dispute that Deputy Chism was employed as a deputy sheriff for the County of San Bernardino and acting in that capacity at the time of the incident.  Under the plain language of subdivision (a), therefore, Deputy Chism was working as a peace officer.[2]

Orosco relies on subdivision (c) of the same statute, which was added in 1996.  This subdivision now states:  "A deputy sheriff of the County of Los Angeles [and other listed counties *not* including San Bernardino] who is

---

[2]     Orosco's reliance on *People v. Lara* (1994) 30 Cal.App.4th 658 is misplaced.  The court in *Lara* interpreted language of section 830.1 stating that " 'any police officer, *employed in that capacity and appointed by the chief of police or the chief executive of the agency*, of a city . . . is a peace officer.' " (*Id*. at p. 665.)  The court "construe[d] the statutory definition to confer peace officer status on any person officially hired to be a police officer by a city agency (i.e., appointed as and given the duties of a police officer by an official of a city agency authorized to do so)."  (*Id*. at p. 666.)  Here, Deputy Chism testified he had been employed as a deputy sheriff for San Bernardino County for over 15 years and, at the time of the incident, had been assigned as a transportation deputy for 12-13 years.  As in *Lara*, this evidence of Deputy Chism's "actual employment" and "regular assignment" as a deputy sheriff "supports a logical and reasonable inference" that he was officially hired and given the duties of a deputy sheriff by the County of San Bernardino and was employed and working in that capacity at the time of the incident.  (*Ibid*.)

employed to perform duties exclusively or initially relating to custodial assignments with responsibilities for maintaining the operations of county custodial facilities, including the custody, care, supervision, security, movement, and transportation of inmates, is a peace officer whose authority extends to any place in the state only while engaged in the performance of the duties of the officer's respective employment and for the purpose of carrying out the primary function of employment relating to the officer's custodial assignments, or when performing other law enforcement duties directed by the officer's employing agency during a local state of emergency." (§ 830.1, subd. (c).)

Orosco reasons that because the County of San Bernardino is not one of the counties listed in subdivision (c), Deputy Chism is not a peace officer. According to Orosco, only deputy sheriffs performing custodial duties in one of the counties listed in subdivision (c) are peace officers, whereas regular deputy sheriffs performing custodial duties in other counties are not.

We are not persuaded. The Legislature enacted subdivision (c) of section 830.1 in 1996 against the backdrop of subdivision (a), which already conferred peace officer status on all deputy sheriffs employed in that capacity. The Legislature did not amend subdivision (a) when it added subdivision (c). Nothing in the statutory language suggests that the Legislature intended to restrict the broader definition of "peace officer" in subdivision (a) when it enacted subdivision (c). If it had so intended, the Legislature could easily have done so by adding qualifying language to subdivision (a). It did not. We will not read into the statute restrictive language the Legislature chose not to include. (*People v. Bautista* (2008) 163 Cal.App.4th 762, 777 ["Under the standard rules of statutory

8

construction, we will not read into the statute a limitation that is not there."].)

The legislative history also supports this result. The original purpose of subdivision (c) was to create a new, lower-tier category of custodial peace officer specifically for the Los Angeles County Sheriff's Department. (Legis. Counsel, Proposed Conf. Rep. on Assem. Bill No. 574 (1995-1996 Reg. Sess.) Aug. 7, 1996, p. 2.)[3] The Legislature intended that this new category of peace officer would have limited custodial duties, more limited training than other sheriff's deputies, and limited peace officer powers only while performing custodial assignments (except in emergencies). (*Ibid.*) The Legislature has since expanded the statute to many other counties (not including the County of San Bernardino). (§ 830.1, subd. (c).)

When it enacted subdivision (c) of section 830.1, the Legislature also amended section 832.3 to exempt this new category of custodial peace officer from the full course of training required for regular sheriff's deputies by the Commission on Peace Officer Standards and Training (POST), and it substituted more limited training requirements. (§ 832.3, subd. (e).) The Legislature also enacted a new provision stating that custodial deputy sheriffs described in section 830.1, subdivision (c) "shall complete" the full POST training "prior to being reassigned from custodial assignments to duties with responsibility for the prevention and detection of crime and the general enforcement of the criminal laws of this state." (§ 832.3, subd. (e)(3).)

Our analysis of the statutory scheme and its legislative history convinces us that the Legislature intended to *add* a new category of custodial

[3] On our own motion, we take judicial notice of this legislative history under Evidence Code sections 452, subdivision (c) and 459. (See *Gananian v. Wagstaffe* (2011) 199 Cal.App.4th 1532, 1541, fn. 9 ["We may take judicial notice of legislative history materials on our own motion."].)

deputy sheriff with limited powers to the definition of a peace officer when it enacted subdivision (c) of section 830.1, but it did not intend to *subtract* from the category of peace officers previously defined in subdivision (a). Before and after 1996, subdivision (a) has conferred peace officer status on any "deputy sheriff, employed in that capacity, of a county . . . ." (§ 830.1, subd. (a).) The plain language of subdivision (a) controls here. Deputy Chism was a deputy sheriff for the County of San Bernardino who was employed in that capacity at the time of the assault.

We can also think of no rational reason why the Legislature would have defined a sheriff's deputy with limited custodial powers and limited training as a peace officer, but not a regular sheriff's deputy with broader authority and full POST training who is performing an equivalent custodial assignment. By Orosco's logic, for example, an assault on a regular sheriff's deputy performing custodial duties in the County of San Bernardino *would not* constitute an assault on a peace officer, but the same assault on a custodial sheriff's deputy with more limited authority in the County of Los Angeles *would* constitute an assault on a peace officer. We must harmonize the statutory provisions to avoid such an absurd result. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95-96.)

Accordingly, based on the undisputed facts, we conclude as a matter of law that Deputy Chism was working as a peace officer at the time of the incident.

## II

Orosco contends that the trial court committed reversible error by denying his request for self-representation under *Faretta.* We agree.

10

A. *Standard of Review*

A trial court's determination regarding the defendant's competence to represent himself is reviewed for substantial evidence. (*Johnson*, *supra*, 53 Cal.4th at p. 531.) The question whether the defendant's assertion of the right to self-representation and waiver of the right to counsel was knowing and intelligent is reviewed de novo. (*People v. Marshall* (1997) 15 Cal.4th 1, 24; *People v. Miranda* (2015) 236 Cal.App.4th 978, 984 (*Miranda*).)

B. *Applicable Law*

In *Faretta*, the United States Supreme Court considered "whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense." (*Faretta*, *supra*, 422 U.S. at p. 807.) The court concluded that the Sixth Amendment includes a right of self-representation. "The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally." (*Faretta*, at p. 820.) "An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." (*Id.* at p. 821.)

The court acknowledged "that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." (*Faretta*, *supra*, 422 U.S. at p. 834.) But "[t]he defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether

in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' " (*Ibid.*)

In *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), the United States Supreme Court considered whether the Constitution permits a State to deny the right of self-representation to a "gray-area defendant" who is mentally competent to stand trial, but lacks the mental capacity to conduct his own defense without counsel. (*Id.* at pp. 173-174.) The court held that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id.* at p. 178.) The court declined to adopt "a more specific standard that would 'deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury.' " (*Ibid.*)

In *Johnson, supra*, 53 Cal.4th 519, the California Supreme Court considered whether California courts may deny self-representation in the circumstances permitted by *Edwards*. (*Id.* at pp. 526-531.) The court held "that trial courts may deny self-representation in those cases where *Edwards* permits such denial." (*Id.* at p. 528.) But the court emphasized that "what is permissible is only what *Edwards* permits . . . ." (*Id.* at p. 530.) Consistent with *Edwards*, "the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Ibid.*)

The *Johnson* court further explained: "A trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Johnson, supra*, 53 Cal.4th at p. 530.) "[W]hen it doubts the defendant's mental competence for self-representation, it may order a psychological or psychiatric examination to inquire into *that* question. To minimize the risk of improperly denying self-representation to a competent defendant, 'trial courts should be cautious about making an incompetence finding without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' " (*Id.* at pp. 530-531.)

Finally, the *Johnson* court emphasized that "[t]rial courts must apply this standard cautiously." (*Johnson, supra*, 53 Cal.4th at p. 531.) "Criminal defendants still generally have a Sixth Amendment right to represent themselves. Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides. Rather, it may deny self-representation only in those situations where *Edwards* permits it." (*Ibid.*)

C. *Analysis of Mental Competence*

Based solely on its perception of Orosco's confusion about two questions on the *Faretta* waiver form, the trial court denied his *Faretta* request on the ground that "it appears defendant is unable to sufficiently represent himself."

13

Under *Edwards* and *Johnson*, this was not an adequate basis to deny Orosco his Sixth Amendment right of self-representation.

To begin with, *Edwards* and *Johnson* both require that the defendant's incompetence to represent himself derive from a "severe mental illness." (*Edwards*, *supra*, 554 U.S. at p. 178 [right of self-representation may be denied to those who "suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves"]; *Johnson*, *supra*, 53 Cal.4th at p. 530 [the legal standard "is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel"].)

" 'Severe mental illness' appears to be a condition precedent. . . . Nothing in the [*Edwards*] opinion suggests that a court can deny a request for self-representation in the absence of this." (*United States v. Berry* (7th Cir. 2009) 565 F.3d 385, 391 (*Berry*); see also *People v. Espinoza* (2016) 1 Cal.5th 61, 80 [referring to "our law permitting the denial of self-representation for defendants who are severely mentally ill"]; *People v. Mickel* (2016) 2 Cal.5th 181, 208 [referring to *Edwards/Johnson* "severe mental illness" standard].)

Here, there is no evidence in the record that Orosco suffered from any mental illness—let alone a severe one. Any confusion Orosco may have had about the waiver form was not by itself evidence of mental illness. And there is no other suggestion of mental illness in the record. "Because there was no evidence before the trial court showing that [he] had such an affliction, *Edwards* was simply off the table." (*Berry*, *supra*, 565 F.3d at p. 391.) And under *Johnson*, a California court may deny self-representation based on

14

mental incompetence "only in those situations where *Edwards* permits it." (*Johnson*, *supra*, 53 Cal.4th at p. 531.)

Orosco's answers on the waiver form and statements at the *Faretta* hearing also did not constitute substantial evidence that he "cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson*, *supra*, 53 Cal.4th at p. 530.)  On the interpreter question, Orosco filled out the form correctly by indicating that he was not requesting one, as he ultimately confirmed at the *Faretta* hearing.  Although Orosco was initially confused when questioned about this issue in court, he then clarified that he spoke English and was not requesting an interpreter.  Even drawing all inferences in favor of the trial court's ruling, Orosco's momentary misunderstanding at the hearing was not evidence of his inability to carry out the basic tasks needed for self-representation.

Orosco's failure to fill out the blank line about his involvement in prior criminal proceedings also did not call into question his mental ability to represent himself.  As Orosco explained, he understood the question to be asking whether he had ever represented himself before.  His interpretation was understandable in light of the fact that the question was, "I have been involved in _____ criminal proceedings in the past *and I feel I am capable of representing myself*."  (Italics added.)  According to Orosco, he left the line blank because he had never represented himself before.  It is not unusual for someone filling out a form to leave a line blank when the answer is zero.  To the extent Orosco may have misunderstood what the question was asking, his simple misunderstanding again did not constitute evidence of inability to carry out the basic tasks of self-representation.  (See *Miranda*, *supra*, 236 Cal.App.4th at p. 987 [defendant's "simple misunderstanding" of question

15

on *Faretta* waiver form was not evidence of mental incompetence to represent himself].)

In its final ruling, the trial court found that Orosco did not know "what a 'criminal proceeding' mean[t] as he seem[ed] to be confused about the sentence that contain[ed] those words." But this finding is not supported by the record. The transcript reflects that Orosco was confused about whether the blank line referred to past criminal proceedings in which he had represented himself. Orosco did not express any confusion about the meaning of a "criminal proceeding."

We emphasize that this was Orosco's first appearance before the preliminary hearing judge who ruled on his *Faretta* motion. The judge had no prior experience or familiarity with Orosco or his mental competence. Her ruling was based entirely on Orosco's responses to the *Faretta* waiver form and his statements at the brief *Faretta* hearing. In these circumstances, we do not owe the same degree of deference to her ruling as we would if she were already familiar with Orosco and his mental functioning. (See *Johnson*, *supra*, 53 Cal.4th at p. 531 ["Such deference is especially appropriate when . . . the same judge has observed the defendant on numerous occasions."].)

On this record, moreover, the court should at least have ordered a mental health evaluation of Orosco before denying his *Faretta* motion. Even if Orosco's possible confusion were enough to raise a doubt about his mental competence to represent himself, the court failed to exercise the caution required before making an incompetency finding " 'without benefit of an expert evaluation . . . .' " (*Johnson, supra*, 53 Cal.4th at pp. 530-531.) Absent evidence of obvious mental illness, a trial judge who has no prior knowledge of the defendant or his mental competence should not deny a *Faretta* request

16

without an expert evaluation based solely on its own non-expert perception of the defendant's mental acuity at the *Faretta* hearing.

In defending the trial court's competency ruling, the People refer to the following additional facts: (1) Orosco's case arose from his "violent noncompliance in jail while awaiting trial in another case" and (2) Orosco purportedly "engaged in unruly behavior in court, including an outburst during the prosecutor's opening statement."[4] But the trial court did not rely on disruptive conduct as a basis for its ruling. A denial of self-representation cannot be affirmed based on "discretionary findings that the trial court did not in fact make." (*People v. Best* (2020) 49 Cal.App.5th 747, 762, fn. omitted (*Best*); *id.* at pp. 761-763 [rejecting People's argument that "the evidence here supported a denial of the *Faretta* motion on grounds of disruptiveness" and ruling "we cannot here uphold the trial court's ruling on this alternative ground" because the trial court did not rely on it]; see also *People v. Welch* (1999) 20 Cal.4th 701, 735 (*Welch*) [denial of *Faretta* motion based on disruptive conduct committed to discretion of trial court].)

Moreover, this would not have been a proper ground to deny the *Faretta* request anyway. A trial court has discretion to deny a *Faretta* motion when the defendant has been "so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his . . . actions or words as to preclude the exercise of the right to self-representation." (*Welch, supra*, 20 Cal.4th at p. 735.) In the absence of "misconduct that seriously threatens the core

---

4     The opening statement is not included in the appellate record. After the People rested, during a discussion about whether Orosco would be taking the stand, defense counsel noted that "he's sort of testifying in my ear the whole time." The trial court responded, "Not only in your ear," then went on to refer to "an outburst" during the prosecutor's opening statement. We are unable to determine the nature or seriousness of this "outburst" from the record.

integrity of the trial" (*People v. Carson* (2005) 35 Cal.4th 1, 6)—such as efforts to intimidate witnesses (*id*. at p. 9)—"misconduct while incarcerated" ordinarily does not justify denial of self-representation. (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1516 [acknowledging that defendant's "repeated episodes of showering jail officials with his excrement are not, without more, a proper ground for denying his request for self-representation"].) Thus, the mere fact that Orosco was being charged with assaulting a deputy in jail would not have been a valid basis to deny his *Faretta* motion.

As for Orosco's conduct during the prosecutor's opening statement, it occurred months *after* the court's ruling on his *Faretta* motion. An appellate court reviewing the denial of a *Faretta* motion may not "rehabilitate the trial court's constitutionally infirm decision by pointing to [disruptive] conduct that occurred after the decision was made." (*Washington v. Boughton* (7th Cir. 2018) 884 F.3d 692, 705; see also *Welch*, *supra*, 20 Cal.4th at p. 734 [trial court may deny self-representation when defendant's conduct "prior to the *Faretta* motion" provides reasonable basis for believing self-representation will create disruption].) Indeed, a criminal defendant's frustration about being denied the right to represent himself—and forced to have an attorney speak for him against his will—may *cause* him to become disruptive when he would not otherwise have been. (See *Faretta*, *supra*, 422 U.S. at 834 ["To force a lawyer on a defendant can only lead him to believe that the law contrives against him."].)

In sum, there is no substantial evidence that Orosco was mentally incompetent to represent himself under the *Edwards/Johnson* standard.

D. *Analysis of Knowing, Intelligent, and Voluntary Waiver*

As an alternative ground for affirming the trial court's ruling, the People argue that Orosco did not knowingly, intelligently, and voluntarily waive his right to counsel. We disagree.

"A knowing and intelligent waiver of the right to counsel is required before a criminal defendant is allowed to represent himself. [Citation.] The defendant should be made aware of the dangers and disadvantages of self-representation so the record shows he is making an informed choice with his eyes wide open. [Citation.] The purpose of this requirement is to determine whether the defendant in fact understands the significance and consequences of his decision and whether that decision is voluntary. [Citation.] On appeal the test is not whether specific warnings or advisements were given. Instead, we examine the record as a whole to determine whether the defendant understood the disadvantages of self-representation, including the risks and complexities of his case." (*Miranda*, *supra*, 236 Cal.App.4th at p. 984)

The record here affirmatively demonstrates that Orosco was able to read and fill out the *Faretta* waiver form; he was made aware of the dangers and disadvantages of self-representation; he understood the significance and consequences of his decision; and he was able to express himself and speak intelligibly and rationally in court. On the *Faretta* waiver form, and again at the hearing, Orosco acknowledged his understanding that it is "generally not wise" for a criminal defendant to represent himself; that the court would not give him any special consideration and would hold him to the standard of an attorney; that his opponent would be a trained, experienced prosecutor; that he had to comply with the rules of criminal procedure and evidence; that he would be waiving incompetency of counsel as an appellate issue; that he had a right to appointed counsel if he could not afford one; and that he knew the

19

penalties he was facing if found guilty. Having been so advised in writing and orally, Orosco confirmed that he still wanted to represent himself.

Orosco's statements to the court communicated "a strong desire to represent himself" and his "answers to the form were also consistent with a voluntary and intelligent waiver." (*Miranda, supra,* 236 Cal.App.4th at pp. 986-987.) Even if Orosco had trouble filling out or understanding some parts of the *Faretta* waiver form, the form "is not . . . a test the defendant must pass in order to achieve self-representation." (*People v. Silfa* (2001) 88 Cal.App.4th 1311, 1322 [rejecting People's argument "that because defendant did not understand some matters on the waiver form, his waiver was not a 'knowing and voluntary' one"]; accord *Best, supra,* 49 Cal.App.5th at p. 760.) Our independent examination of the record convinces us that Orosco's waiver was knowing, intelligent, and voluntary. (*Miranda,* at p. 987; see also *Faretta, supra,* 422 U.S. at pp. 835-836 [defendant's waiver voluntary where the record affirmatively showed he "was literate, competent, and understanding" and trial judge had "warned [him] that he thought it was a mistake not to accept the assistance of counsel, and that [he] would be required to follow all the 'ground rules' of trial procedure"].)

Erroneous denial of a *Faretta* motion is reversible per se. (*Best, supra,* 49 Cal.App.5th at p. 764.) "Applying this rule, we must reverse the judgment and remand the matter for a new trial. [Citation.] Because we do so, we need not consider defendant's remaining contentions on appeal." (*Ibid.*) "We emphasize that our decision is based on the record as of the time the trial court denied defendant's *Faretta* motion. Nothing we say here prevents the trial court on remand from evaluating defendant's competence to represent [himself], and the potential for disruption, based on conditions as they exist at the time of any new motion for self-representation." (*Ibid.*)

## DISPOSITION

The judgment is reversed.  The matter is remanded for a new trial.  If defendant again seeks to represent himself on remand, the request shall be evaluated based on the record before the court at the time of the ruling on any such motion.


BUCHANAN, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.