Filed 5/20/15 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B256806 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA075380) |
| v. | |
| DAVID MIRANDA, | **ORDER MODIFYING OPINION** [There is no change in judgment] |
| Defendant and Appellant. | |

GOOD CAUSE appearing, the opinion filed May 13, 2015, in the above entitled matter is hereby modified as follows:

1.    On page 13, lines 2 and 3 of section 5 of our DISCUSSION, delete the second sentence, that reads, "Where a defendant's out-of court admissions are at issue, the trial court has a sua sponte duty to give the instruction. (*People v. Diaz* ___ Cal.4th ___, (2015 WL 1514586, slip opn. at p. 6, (April 6, 2015)(*Diaz*).)" in its entirety and replace it with the following: "At the time of Miranda's trial, the courts had a sua sponte duty to give this instruction whenever a defendant's out of court admissions were at issue. (*People v. Diaz* ___ Cal.4th ___, (2015 WL 1514586, slip opn. at p. 6, (April 6, 2015)(*Diaz*).)"

[end of modifications]

There is no change in judgment.

_____
BIGELOW, P. J.                    RUBIN, J.                    GRIMES, J.

Filed 5/13/15 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B256806 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA075380) |
| v. | |
| DAVID MIRANDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Martin L. Herscovitz, Judge. Affirmed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, for Plaintiff and Respondent.

_____

David Miranda appeals from his convictions for making criminal threats and resisting arrest, contending that the trial court erred by granting his pretrial motion to represent himself and by not later reversing that order after his mental health issues became apparent during the trial. We affirm because the record shows that his waiver of the right to counsel was knowing and voluntary, and there was no showing that he was unable to perform the basic tasks needed to represent himself without the help of counsel.

## FACTS AND PROCEDURAL HISTORY

At around 4:00 p.m. on September 23, 2013, Ana Miranda called 911 to report that her son David Miranda, 25, had a gun and was going to kill her or others.[1] By the time the police arrived, however, Miranda had left the scene. At around 10:00 p.m. that night, Miranda approached Ruth Reyes, who lived in an adjacent apartment building, and threatened to get his gun and kill her and "kill you all." Reyes called 911, prompting Los Angeles Police Officers Smith and Franco to come to the scene.

As the officers interviewed Reyes they heard Miranda screaming, "Fuck you" and "What the fuck you looking at?" Miranda was more than six feet, six inches tall and weighed more than 300 pounds. He walked quickly toward the officers, saying, "Fuck you cops. You can both suck my dick." Officer Smith knew Miranda from previous encounters and was aware that Miranda had a history of violence. The officers ordered Miranda to stop and put his hands up. Miranda instead continued to advance on the officers, began flailing his hands, and flung open the apartment building's gate. When the officers ordered Miranda to get down on the ground, he said, "Fuck you. I'll kill you both." Officer Franco tasered Miranda after Miranda reached into his waistband. A search revealed that Miranda had not been armed.

Miranda was charged with one count of making criminal threats to Reyes (Pen. Code, § 422) and two counts of resisting arrest (Pen. Code, § 69). At a December 2013 hearing Miranda's public defender said she was not yet ready for trial and that Miranda

---

[1]     We will refer to David Miranda by his last name and to Ana Miranda as mother.

2

wanted to go to trial right away. When the trial court told the public defender that she was in charge of the timetable Miranda asked to represent himself. The trial court granted that request.[2]

Reyes and the two police officers testified at trial. Independent eyewitness Juan Diaz corroborated the officers' version of events. Mother testified that Miranda was bipolar and schizophrenic and lost control when he was not taking his medication. He had tried to commit suicide. When she called 911 she lied about Miranda having a gun in order to make sure the police responded. Mother also testified that Reyes had a grudge against Miranda.

Miranda testified that he argued with his mother on September 23 because she forgot to wish him a happy birthday, leading him to break her cable television box. He did not threaten his mother, and claimed she called 911 out of frustration. Miranda then went to a park to play basketball because his psychiatrist told him to cope with stress by exercising. He felt sad and if he had had a gun would have killed himself.

On his way home from the park he stopped at a friend's house, where he drank three shots of tequila. As he approached his mother's apartment building, it was dark and he could not see the police. Miranda heard someone say, "Hey, come here." He thought it might be members of Reyes's family, who were angry at him and wanted to beat him up. He reached into his waistband to get his keys so he could open the gate, when he saw a gun pointed at him. He said, "What the fuck?" and then was tasered. The police roughed him up and "tortured" him. Miranda and his family had had run-ins with the police before and he believed the police had a grudge against him. He never threatened Reyes.

Miranda's mental health issues were mentioned several times during the trial. His mother testified that he tried to kill himself several times, and that he was bipolar and schizophrenic and was out of control when not medicated. His sister testified that he

---

[2] We discuss the facts concerning the grant of Miranda's self-representation request in more detail in section 2 of our DISCUSSION.

needed his medications. During a discussion with the trial court about whether his brother should testify, Miranda said he used to attend special education classes and had trouble explaining himself. Miranda testified that he had "mental disabilities," and that he had mental health issues that were "not like retardation; but, like, I'm kind of slow . . . ." During his rebuttal argument the prosecutor told the jury, "The defendant has mental problems. That's clear."

The jury convicted Miranda of all three counts. Shortly after the jury began deliberating the trial court said: ". . . I wanted to state for the record that I didn't know anything about the defendant's mental history before the first witness testified. That never was brought to my attention at the time the defendant went pro per [*sic*] or during the pretrial stages of this case. That was news to me when his mother testified as the first witness. Not that my decision would have been any different, because I think he handled himself fairly well during the trial."

When it came time to set a sentencing hearing, the trial court reminded Miranda that stand-by counsel had been present throughout most of the trial and suggested that counsel could be helpful in addressing Miranda's mental health issues for sentencing purposes. The trial court asked if Miranda wanted to let stand-by counsel represent him from that point on and Miranda agreed. When the trial court told Miranda that his lawyer would explain how his criminal threats conviction qualified as a strike under the Three Strikes law, Miranda said, "I didn't even never understand nothing because due to my disabilities."

At the next hearing the trial court ordered a psychiatric examination of Miranda to assess his "history, prognosis, and dangerousness." The trial court wanted that information "[b]ecause I don't know if he was in treatment, how long he'd been in treatment, who was treating him, what drugs were prescribed. I didn't know any of that, and all of that would bear on the sentencing in this case." At the next hearing Miranda said the only medication he was receiving in jail was for pain. At defense counsel's request the trial court ordered a medical evaluation to resolve the medication issue. At a hearing a few weeks later defense counsel asked whether Miranda should be housed in

4

the jail's mental health unit because he had been taking Cymbalta, an anti-depression and anti-anxiety medication. The trial court ordered that Miranda be evaluated for that purpose.

When the sentencing hearing finally took place the trial court noted that it had received a report from a psychologist who examined Miranda. The report is not in the record, however, and its contents were not described. The trial court imposed a combined state prison sentence of three years and eight months, but suspended that sentence and placed Miranda on probation subject to numerous conditions, including his enrollment in an intensive program of mental health services. Before doing so, the trial court said: "This is how I see the case. [Had] the defendant not represented himself at this trial and pretrial, there's no question in my mind that had the defendant retained or had appointed competent counsel a disposition like the one that I intend to go forward could have been negotiated for this defendant. He was his own worst enemy by attempting to represent himself specifically with his mental health history of [*sic*] and the court has been totally unaware throughout the entire pretrial and trial. I did not know about the defendant's history of mental counseling and drug intervention psychotropic drug intervention until the middle of the trial in this case. No one told me, the prosecutor never told me. Mr. Miranda never told me. I was totally unaware of it until when I looked at the defendant's records of mostly juvenile misdemeanor matters and a single felony vandalism matter which I assume was some sort of graffiti."

Miranda contends that the trial court erred by: (1) initially granting his request to represent himself without determining whether his mental health issues prevented him from making a knowing and intelligent waiver of his right to counsel; and (2) by failing to inquire into the matter once his mental health issues were brought to the court's attention during the trial.

5

**DISCUSSION**

1.     *The Law Regarding a Defendant's Right to Self-Representation*

The Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves. (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).)

A knowing and intelligent waiver of the right to counsel is required before a criminal defendant is allowed to represent himself. (*People v. Noriega* (1997) 59 Cal.App.4th 311, 319.) The defendant should be made aware of the dangers and disadvantages of self-representation so the record shows he is making an informed choice with his eyes wide open. (*Ibid.*) The purpose of this requirement is to determine whether the defendant in fact understands the significance and consequences of his decision and whether that decision is voluntary. (*Ibid.*) On appeal the test is not whether specific warnings or advisements were given. Instead, we examine the record as a whole to determine whether the defendant understood the disadvantages of self-representation, including the risks and complexities of his case. (*Ibid.*) Our examination of the record is de novo. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070.)

The right of self-representation was not recognized in California when *Faretta* was decided. (*People v. Johnson* (2012) 53 Cal.4th 519, 526 (*Johnson*).) After *Faretta,* California courts tended to view this right as absolute so long as the defendant validly waived his right to counsel. (*Ibid.*) In *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*) the high court recognized the existence of "gray-area defendants": those who are mentally competent to stand trial but who suffer from severe mental illness that renders them incompetent to conduct trial proceedings by themselves. (*Id.* at pp. 174, 177-178.) In such cases the United States Constitution gives states the option of insisting upon representation by counsel. (*Id.* at pp. 177-178.)

*Edwards* did not hold that due process requires a higher standard of mental competence for self-representation than for trial with counsel; it only allows states to impose a higher standard without violating *Faretta.* (*People v. Taylor* (2009) 47 Cal.4th 850, 877-878 (*Taylor*).) In *Johnson, supra,* 53 Cal.4th 519, the California Supreme Court

6

accepted *Edwards's* invitation and held that our trial courts have discretion to deny a defendant's *Faretta* motion consistent with the holding in *Edwards*. (*Id.* at p. 528.) Declining to adopt a specific standard, *Johnson* held that trial courts may exercise their discretion to deny self-representation if the "defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id.* at p. 530.)

2.      *The Facts From Miranda's* <u>Faretta</u> *Hearing*

At the December 2013 hearing where Miranda's public defender said she needed more time to prepare for trial Miranda said: "I'm willing to represent myself if my attorney is not – will not be able to be ready because I asked for my rights as a speedy trial. . . . So I'll be prepared myself to represent myself in a court of law, sir." The trial court said it would grant the request if it were knowing and intelligent, but cautioned Miranda that the request could not be contingent. "You either want to represent yourself or you want an attorney. There's no 'if' involved. It's one or the other." Miranda replied, "I want to represent myself, sir." The trial court then provided Miranda with a *Faretta* waiver form and sent him back to lockup to read it.

The form asked Miranda to initial boxes next to statements that described his constitutional rights, including the rights to an attorney, a speedy trial, to subpoena witnesses and records, to confront and cross-examine witnesses, and the right against self-incrimination. The form also included a comprehensive list of the dangers and disadvantages of self-representation, as well as advice from the court that he not represent himself. Miranda initialed all those boxes, including one that said he understood all that he had read and been told and still wanted to represent himself. He signed and dated the form underneath a statement that he had read, understood, and considered all the warnings and freely and voluntarily chose to represent himself.

Miranda gave his proper age and year of birth on the form. He checked a box stating he was a high school graduate, but when asked "High School Attended" wrote in the number twelve. He listed no employment experience, and, under "Legal Education,"

7

wrote "Immigration." Miranda wrote on the form that he had previously and successfully represented himself in federal court in 2011, an apparent reference to his grant of asylum in the United States. In the section captioned "CHARGES AND CONSEQUENCES" Miranda checked the "no" box in response to questions concerning whether he knew: (1) if the crimes charged were specific or general intent crimes; (2) the facts that had to be proved in order to find him guilty; and (3) the legal defenses to the crimes he was charged with.

When Miranda returned to the courtroom with the signed waiver form, the trial court asked whether he had read the form. Miranda answered yes. He answered yes when asked if he wanted to represent himself and whether the initials in the boxes on the form were in fact his. Miranda answered yes when asked whether, by initialing and signing the form, he was telling the court that he understood he had the constitutional right to an attorney and whether he understood the dangers and disadvantages of representing himself. The court then asked: "And knowing all of those consequences and what can happen to you, and the fact that you will not be given any special consideration, and I personally advise you not to represent yourself, you still want to represent yourself?" Miranda answered yes and the trial court granted his *Faretta* motion.

3. *The Trial Court Did Not Err by Granting the* Faretta *Motion*

Miranda contends the trial court erred by granting his *Faretta* motion because it did not know about his mental health problems, relied primarily on the waiver form he signed, and engaged in only perfunctory questioning before finding that his waiver was knowing, intelligent, and voluntary. In connection with this he contends the trial court erred by leaving him to read and fill out the form himself without the assistance of his public defender. Finally, he contends that certain omissions from or answers to the form should have raised doubts about the validity of his waiver.

While it is preferable to question a defendant about his responses to a written waiver form, the failure to do so does not necessarily invalidate a waiver where there is

8

no indication the defendant did not understand what he was reading and signing. (*People v. Blair* (2005) 36 Cal.4th 686, 709, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)[3]

This was not a case where the trial court relied solely on the waiver form. After Miranda signed the form the trial court asked him whether by signing and initialing the form he had in fact read and understood it. Miranda answered yes. The court also asked Miranda whether he still wanted to represent himself despite his knowledge, including the loss of his right to counsel and the court's advice that he not represent himself. Miranda again answered yes. His statements to the court were clear and direct and showed a strong desire to represent himself.

Miranda's answers to the form were also consistent with a voluntary and intelligent waiver. He signed the waiver form after initialing all the boxes concerning the rights he was giving up and the risks he assumed by choosing to represent himself. His initials, handwriting, and signature appear clear and legible. He dated the form correctly, said he was a high school graduate, and correctly gave his age and year of birth.

Miranda complains that the contents of his waiver form should have alerted the trial court that there was a problem. He points to the following: (1) his failure to initial the boxes in the section dealing with the dangers of self-representation; (2) his answers that he did not know the elements of the charged offenses or his potential defenses; (3) his answer of "12" to the question "High School Attended"; and (4) his answers that he had represented himself successfully in federal court on an immigration matter. We disagree.

---

**3**     Miranda cites *In re Ibarra* (1983) 34 Cal.3d 277 for the proposition a waiver is valid based solely on the defendant having signed a waiver form only if defense counsel first advised the defendant of his rights. *Ibarra*, which was overruled on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 360-361, concerns a defendant's waiver of rights in connection with entering a guilty plea and is therefore inapplicable. He also relies on *People v. Lopez* (1977) 71 Cal.App.3d 568, which merely suggested areas of inquiry by the trial court when considering a *Faretta* motion. *Lopez* pre-dates *Blair* and as *Noriega, supra,* 59 Cal.App.4th at page 319 notes, no particular form of advisement is required.

First, the waiver form in fact shows Miranda's initials next to the boxes concerning his knowledge of the risks of self-representation. Second, his supposed ignorance of the charges and defenses was belied by his defense at trial, which was based on his assertion that he threatened nobody and had instead been targeted for retaliation by the police. Third, the answer "12" to the question "high school attended" seems to be nothing more than a simple misunderstanding, apparently referring to highest grade completed rather than the name of the school. Fourth, the same appears true of Miranda's response to the question about prior self-representation in criminal matters. A layperson might not understand that an immigration proceeding is civil and, in any event, it showed that he had acted on his own behalf before in proceedings that carried serious consequences. Fifth, while consultation with his public defender before signing the waiver form might have been preferable, Miranda's failure to do so does not by itself undermine the factors that show his waiver was knowing and voluntary. Finally, nothing in the record indicates that at the time of Miranda's *Faretta* motion he manifested a mental illness, much less a severe one, that prevented him from carrying out the basic tasks of self-representation without the assistance of counsel.[4]

In short, our independent examination of the record convinces us that Miranda's waiver was knowing, intelligent, and voluntary. (*People v. Koontz, supra,* 27 Cal.4th at p. 1070.) We therefore hold that the trial court did not err by granting the *Faretta* motion.

4.      *The Trial Court Did Not Err by Not Making Further Inquiry During Trial And Reversing Its* Faretta *Order*

As the trial court said, it had no indication before the trial started that Miranda had mental health problems. However, those became apparent shortly after the trial began. At various points throughout the trial, the court heard that Miranda had bipolar disorder

---

[4]      As Miranda points out, a parole report dated two months before the *Faretta* motion stated that he was bipolar and schizophrenic and had been placed on 72-hour mental health holds. However nothing in the record shows that the trial court had seen the report at that time.

and schizophrenia that had to be controlled by medication, that he had attempted suicide, and that in Miranda's own words, he was "kind of slow." Miranda contends that once the trial court learned about his mental health condition it was required to conduct an inquiry into his competence to represent himself and should then have terminated his right to do so.

Neither *Johnson, supra,* 53 Cal.4th 519, nor *Edwards, supra,* 554 U.S. 164, support this contention. " '. . . *Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent.' " (*Taylor, supra,* 47 Cal.4th at p. 878, quoting *State v. Connor* (2009) 292 Con. 483 [973 A.2d 627, 650].) As a result, no constitutional error occurs when a mentally ill defendant's request to represent himself is granted. (*Taylor,* at p. 891.)

Moreover, a "trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Johnson, supra,* 53 Cal.4th at p. 530.) When such doubts arise, the trial court may order a psychological examination on that issue. (*Ibid.*) Even though the court's own observations play a key role in the process, in order to minimize the risk of improperly denying self-representation to a competent defendant, the trial courts should avoid making an incompetence finding without an expert's evaluation. (*Id.* at pp. 530-531.)

Because criminal defendants still generally have a Sixth Amendment right to represent themselves, trial courts must exercise their discretion cautiously. (*Johnson, supra,* 53 Cal.4th at p. 531.) A valid invocation of the right of self-representation "remains the norm and may not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides. Rather, it may deny self-representation only in those situations where *Edwards* permits it." (*Ibid.*)

11

Although *Edwards* and *Johnson* expressly grant trial courts the discretion to deny self-representation under certain circumstances, those courts did not address when, or even whether, trial courts may revoke that right after it has been granted. Assuming that a defendant has a "right" to have the court revoke his pro per status if the court becomes aware of defendant's serious mental disability, we therefore have no guidance as to the appropriate standard of review. We need not address this issue, however, because under any possible standard of review the record shows that Miranda was capable of performing the basic tasks of self-representation without the assistance of counsel.

We recognize that Miranda was sometimes inarticulate and ineffective. Of course that is no doubt the norm in many self-represented cases, not the exception. Those are the risks assumed by any defendant who chooses to represent himself. (*Taylor, supra,* 47 Cal.4th at p. 866 [the likelihood or actuality of a poor performance does not defeat the right of self-representation].) Both the trial court and standby defense counsel concluded that Miranda did a reasonable job of defending himself. The record bears this out.

He made an opening statement which, although brief and inelegant still conveyed the essence of his defense: that the witnesses against him were lying and that he had been the victim of discrimination and a false arrest. He objected, albeit unsuccessfully, that the prosecutor was leading a witness. He objected successfully to the courtroom presence of a possible witness. He asked that the entire recording of his mother's 911 call be played for the jury. He cross-examined his mother about Reyes having a grudge against him. He cross-examined Reyes in detail about the incident, including the timing and her precise whereabouts, what she was able to see, what he was wearing, what she recalled about his argument with mother earlier in the day, and that there were video cameras outside the building that would have captured at least parts of the incident. Miranda cross-examined Officer Smith about the timing and details of the incident and also asked about past encounters with Miranda and his family in an effort to show that Smith was biased against him. He objected successfully to the prosecutor's mid-trial request to amend the information to allege a Three Strikes conviction, arguing that it was

12

not "fair because he should have told me at the beginning." Miranda also successfully objected to a prosecution rebuttal witness.

The only wayward example of his conduct that Miranda points to is his decision to wear a jailhouse jumpsuit on the day he testified instead of the civilian clothes he wore every other day of the trial. Miranda told the jury that he chose to wear his jail clothes that day in order to show them that he was being prosecuted for the way he lived and was in jail every day. As respondent points out, this is sometimes considered a reasonable tactical decision by defense counsel in order to gain the jury's sympathy. (*Estelle v. Williams* (1976) 425 U.S. 501, 508; *People v. Scott* (1997) 15 Cal.4th 1188, 1214-1215; *People v. Williams* (1991) 228 Cal.App.3d 146, 151.) While we might disagree with Miranda's decision, it falls within the range of reasonable trial tactics. Based on the record, it appears beyond a reasonable doubt that Miranda performed the basic tasks of defending himself without assistance of counsel. We therefore conclude that the trial court did not err by failing to conduct an inquiry into Miranda's mental state and concomitantly revoking his *Faretta* waiver.

5.    *Failure to Instruct Jury to View Admissions With Caution*

CALCRIM No. 358 instructs the jury to view with caution any out-of-court oral admissions made by a defendant. Where a defendant's out-of court admissions are at issue, the trial court has a sua sponte duty to give the instruction. (*People v. Diaz* ___ Cal.4th ___, (2015 WL 1514586, slip opn. at p. 6, (April 6, 2015)(*Diaz*).) Miranda did not request that instruction, but contends the trial court was required to give the instruction on its own.

The court in *People v. Zichko* (2004) 118 Cal.App.4th 1055 (*Zichko*) considered whether that instruction was required as to evidence of the verbal threats made by a defendant on trial for making criminal threats. The *Zichko* court held that the instruction was not required, differentiating between admissions made in a criminal case generally, which were concessions of guilt, and statements that constituted the crime itself. (*Id.* at pp. 1059-1060.) Our Supreme Court overruled *Zichko* after this matter was submitted.

13

(*Diaz, supra,* 2015 WL 1514586), and we asked the parties to submit supplemental briefs concerning the effect of the new decision.

The *Diaz* court held that CALCRIM No. 358 was a proper instruction in cases involving criminal threats (*Diaz, supra,* 2015 WL 1514586, slip opn. at pp. 4-5), but held that there was no longer a sua sponte duty to give it in any case where the issue arose. (*Id.* at pp. 6-7.) However, the *Diaz* court declined to decide whether its elimination of the sua sponte rule for CALCRIM No. 358 was retroactive. (*Id.* at p. 11.) The *Diaz* court concluded that the trial court's failure to give the instruction was harmless because it was not reasonably probable the jury would have reached a more favorable result had it been given. (*Id.* at pp. 11-12.)

Respondent's supplemental brief contends that the elimination of the sua sponte rule in *Diaz* should be retroactive. Miranda of course contends otherwise. We need not reach this issue, however, because even if the trial court erred, its error was harmless. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 94.) We examine the record to see whether there was a conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. (*People v. Dickey* (2005) 35 Cal.4th 884, 905.) Where there is no such conflict in the evidence, but simply a denial by the defendant that he made the statements attributed to him, the failure to give the cautionary instruction is harmless. (*Id.* at p. 906.)

There is no conflict about the statements attributed to Miranda by Reyes and the two police officers. Instead, Miranda denied making any threats. Therefore the error is harmless.

## DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.                                    GRIMES, J.

14