Filed 3/7/25  P. v. Chandler CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KENNETH CHANDLER,<br><br>    Defendant and Appellant. | D082551<br><br><br>(Super. Ct. No. SCE416610) |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Michelle T. Livecchi-Raufi, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Kathryn Kirschbaum, and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

Kenneth Chandler appeals his conviction for attempted robbery (Pen. Code,[1] §§ 664 & 211), possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)), and possession of paraphernalia used for narcotics (Health & Saf. Code, § 11364). Chandler argues that the trial court prejudicially erred by: (1) failing to inquire into his competence to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) and *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*); and (2) denying his requests for advisory counsel.

We conclude that Chandler's assertion of the right to self-representation and waiver of the right to counsel was knowing and intelligent, and any error in the trial court's inquiry or advisement was harmless. We further find substantial evidence supports the finding that Chandler was mentally competent to represent himself. Lastly, we conclude that the court did not prejudicially err in denying Chandler's requests for advisory counsel. Accordingly, we affirm.

---

[1]    Undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Attempted Robbery*

One afternoon in March 2023, M.B., a maintenance technician, was sitting in his employer-provided truck in a parking lot in Lemon Grove. He was on the phone with a coworker when he heard yelling and saw Chandler standing near the driver's side window. Chandler yelled, "Give me 70 fucking dollars right now," and pulled on the truck's door handle, but the door was locked. Chandler pulled aggressively on the handle a few times before backing away. Afraid that Chandler might attack him, M.B. started the truck and drove out of the parking lot. M.B. pulled over a short distance away and called 911.

Sheriff's deputies responded to the call and approached Chandler, who matched the description M.B. gave to the 911 dispatcher. Chandler was with an elderly man named Frederick G. when the deputies found him. After the deputies detained Chandler, M.B. identified him as the man who approached his truck. During a search of Chandler's belongings, deputies found a plastic bag with psychedelic mushrooms in his jacket pocket and a methamphetamine pipe.

*B. Pre-Trial Proceedings*

      1. <u>*Faretta* Waiver</u>

The People charged Chandler with attempted robbery (Pen. Code, §§ 664 & 211), possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)), and possession of paraphernalia used for narcotics (Health & Saf. Code, § 11364).  The information also alleged prior probation denials (Pen. Code, § 1203, subd. (c)(4)), a prior serious felony conviction (Pen. Code, §§ 667, subd. (a)(1), 668, & 1192.7, subd. (c)), and a prior strike conviction (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, & 668).

At his arraignment before the Honorable John Thompson in March 2023, Chandler's attorney informed the court that Chandler intended to represent himself, but had not completed the required form.  At another hearing before the Honorable Roderick Shelton, Chandler's counsel reported that even after he had advised Chandler of the disadvantages of self-representation, Chandler still wanted to represent himself and was ready to submit a completed *Faretta* waiver form.  In addition to listing his charges and providing his educational and work background, Chandler wrote that he believed his maximum punishment upon conviction would be "6.5 [to] seven point five years at eighty percent[.]"

On the form's second page, Chandler initialed several paragraphs describing the dangers and disadvantages of self-representation, including that self-representation "is almost always unwise," he would get no "special treatment or favors," he may "be unaware of . . . potential defenses," and "that being incarcerated will make it difficult . . . to contact witnesses and investigate" his case.

On the third page of the form, Chandler initialed next to a paragraph stating: "I am aware that I am not automatically entitled to an investigator

4

or 'legal runner' to provide assistance. In order to obtain such assistance, I may be required to file a written motion with the court justifying my need for it. If an investigator/runner is appointed I will be required to follow the procedures of the appointed office for obtaining assistance and I may not receive all the assistance I want or feel I need." Chandler also initialed the form to acknowledge he understood that he did "not have a right to advisory, standby or co-counsel."

After Judge Shelton reviewed the form, he questioned Chandler about, among other things, whether he understood that he has a constitutional right to an attorney and that the right protects him from the dangers and disadvantages of self-representation. After stating that he understood, Chandler asked whether he would be allowed to request advisory counsel. Judge Shelton said that while making a request is allowed, "that doesn't mean it's going to be granted." Judge Shelton then asked Chandler whether he understood the consequences of conviction, and Chandler said he did. When questioned about his education and his familiarity with the legal system, Chandler confirmed that he had attended the University of Georgia for one year, had "studied the law," intended to use the law library while detained, and knew the elements of his offenses.

After advising Chandler once more that he should not waive his right to an attorney, Judge Shelton granted his request for self-representation. Judge Shelton also appointed the Office of Assigned Counsel (OAC) to act as a legal runner for Chandler and to provide him with ancillary services.

2. Readiness Hearings and Settlement Conferences

At a readiness hearing the following week in late March 2023, the prosecutor informed Judge Shelton that Chandler had just been arraigned the day before on separate charges in another court downtown. The

5

prosecutor stated that during the downtown proceeding, Chandler requested to represent himself but did not understand the court's explanation of his rights and responsibilities. Chandler ultimately accepted appointed representation in the downtown proceeding and informed the judge that he was "not receiving his meds." That court suspended proceedings so that Chandler could undergo a psychiatric evaluation in early May under section 1368, which allows a judge who doubts a defendant's mental competence to "recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time." (§ 1368, subd. (a).)

Chandler confirmed to Judge Shelton that the prosecutor's summary of the downtown hearing was accurate, and Chandler proceeded to explain that he had "just started" a new medication regimen and that his body "had just started to adjust to it." He stated he was "just fine" and "feeling better today." At the prosecutor's suggestion, Judge Shelton continued the readiness hearing to see if Chandler's attorney in the downtown case could provide more information about those proceedings. When Chandler asserted that he could answer section 1368 questions "perfectly . . . right now," Judge Shelton observed that Chandler did appear to be "alert and responsive" and seemed "fine" that day, but that it would be "a good idea to trail this to get a handle on this issue."

The parties proceeded to discuss plea negotiations. Chandler offered to plead guilty to two misdemeanor charges of disorderly conduct and attempted theft by deception, with a stipulation that he would get psychiatric care at a facility he had visited in the past. The prosecutor rejected the offer, but engaged in lengthy dialogue with Chandler on the record about probation, supervised release, and treatment options. At the end of the hearing, Judge

6

Shelton reiterated that he would "need to see about the 1368" downtown and "get a better handle on our options." At Chandler's request, Judge Shelton said he would recommend access to the law library for him, as well as medical and psychiatric referrals for medications. Chandler again declined to have an attorney appointed to represent him.

At a settlement conference the following week in early April 2023, Chandler told Judge Shelton he was having trouble getting OAC "to do any legal running" for him, that he had "written up all of [his] own motions," and that there were delays in receiving services because OAC did not have his file. Judge Shelton said that the minutes would again reflect that OAC had been appointed. After the parties failed to reach an agreement on plea offers, Chandler requested "side counsel, advisory counsel and co-counsel," and Judge Shelton said he was denying that request "at this time."

In early May 2023, the court held another settlement conference. After the parties again failed to reach an agreement, Chandler requested co-counsel "for a lot of different reasons," including that he suffers from attention deficit disorder, he was getting "the wrong meds at the jail," and OAC was denying many of his requests. Judge Shelton reminded Chandler that in his *Faretta* form, Chandler indicated he understood that he has no right to advisory, standby, or co-counsel. After confirming that Chandler was making the request anyway, Judge Shelton denied it.

3. <u>Motion Hearings</u>

In early June 2023, the Honorable Patricia Cookson heard some of the motions filed by Chandler and deferred others to be ruled on by the trial judge. In one of his motions, Chandler requested a court-appointed psychologist. Judge Cookson informed Chandler that he would "need to work with OAC to try to get a psychologist." The parties then had another

7

discussion about plea offers, during which the prosecutor informed the court that Chandler was representing himself in the downtown case, which was set for arraignment in a few days.

Two weeks later, the day before trial was set to begin, Chandler appeared before Judge Thompson to discuss motions in limine. Chandler informed the court that he "was hoping to get a doctor to speak for [him]" at trial, and that he wanted a forensic psychologist to help him "testify about intimate partner battery and idiocy." When Judge Thompson asked how a psychologist's testimony would be relevant, Chandler argued that his "paradoxical behavior" on the day of the incident stemmed from an alleged battery by Frederick G., Chandler's companion. He further argued that Frederick G. was walking into traffic with Chandler's belongings when the incident occurred, and that Chandler was yelling at Frederick G., not at M.B. Judge Thompson explained that Chandler and Frederick G. would have the opportunity to testify about those events themselves, and that it was unnecessary to have a psychologist or psychiatrist address those topics.

Later in the same hearing when Judge Thompson asked Chandler whether he still wanted to represent himself at trial, Chandler again requested "advisory counsel or a co-counsel or a side counsel." Judge Thompson said, in relevant part, "Can't do that. . . . Can't do that. I can – you're entitled to be represented. But if you are represented, then that attorney is going to put on the case for you." After Chandler opted to continue without counsel, he asked the court whether he could present a defense based on his belief that Frederick G. or someone in Frederick G.'s family was "involved in this artificial intelligence" that allowed them to "recreate" the voices of Chandler's family members. Chandler told Judge Thompson that he had been "kept up all night for almost three months" by

8

those voices, prompting the prosecutor to request that Chandler either call a medical expert at trial or be precluded from providing a lay opinion about his mental health or hearing voices. When Judge Thompson suggested that Chandler "should be requesting a continuance" if he wanted to have a psychological evaluation done, Chandler expressed uncertainty about how long that might take. Judge Thompson commented that it was unclear "how any previous treatments or mental conditions are relevant," and that if Chandler had a medical condition at the time the crime was committed, "that should have been explored, and this case is not ready to go forward."

Chandler did not request a continuance and instead moved on to discussing other potential defenses. He asked if he could testify about medication side effects and post-traumatic stress disorder (PTSD), and Judge Thompson ruled that Chandler would be precluded from addressing PTSD, "or other psychological conditions that may or may not have been diagnosed," without proper foundation and expertise. Towards the end of the hearing, when Chandler inquired about presenting a diminished capacity defense, Judge Thompson suggested that doing so would be difficult without psychological evaluations, and that the facts in the case might not support such a defense.

*C. Chandler's Self-Representation at Trial*

At trial, the People called M.B., the arresting officer, a criminalist who analyzes controlled substances, and Frederick G. as witnesses. Chandler cross-examined each of those witnesses. At the close of the People's case when the parties were discussing what would happen during the jury instruction conference, Chandler and Judge Thompson had the following exchange, in relevant part:

9

"THE DEFENDANT: Well, can I ask for a Public Defender for the conference? Because I don't know how to argue that.

"THE COURT: No, no, no. You made your determination that you were going to represent yourself. I'm not so sure that I could appoint a Public Defender at this time to represent you for that purpose only.

"THE DEFENDANT: Well, I didn't know the – I didn't know the public – I didn't know the OAC was going to deny so many of my handwritten and typewritten –

"THE COURT: Requests.

"THE DEFENDANT: Ancillary requests and requests for a psychologist. I sent – I sent them, and then I changed – changed, and the form fitted what they asked me to – what they were requesting me to send as part of the justification. They still didn't accept it. It was form-fitted to the rules, and . . . OAC seems to think – 'Confusing and incoherent paperwork, submittal non-actionable' is one of [OAC's] comments.

"THE COURT: . . . If you're requesting – I have to understand your request now. If you're making a motion to have counsel now appointed to represent you and forfeiting your pro per status, you have to make that motion, and I have rule to that motion. But I'm not so sure that's what you're requesting.

"THE DEFENDANT: How long would – well, if I do that, how long would it take? How long would it take to get me counsel?"

Judge Thompson explained that he would declare a mistrial, continue the case for at least "a couple of months," re-appoint the Public Defender's Office to represent Chandler, and then empanel another jury.

10

After deciding to continue his self-representation, Chandler asked the court if he could present an "idiocy" defense, citing "a lot of brain damage from early in life" after a dentist "gave nitrous" and his mother "started giving [him] these air horns." Judge Thompson responded that "a lot of these things would have been addressed by your counsel" and "they would have hired, potentially, psychiatrists, psychologists to examine you, examine all of your medical records. And there potentially could have been psychiatric testimony or psychological testimony on your behalf presented by a qualified professional to suggest that you could not have formed the requisite intent to commit these crimes . . . at the time. It's a very complex issue." Judge Thompson observed, however, that there was no such evidence admitted, and while Chandler would have "a little leeway" to discuss his background, he would not be permitted to "go too far afield" on the topic. Judge Thompson reiterated that explaining his mental state to the jury was "a hell of a burden to take on as a pro per," and asked again whether Chandler still wanted to waive counsel. Chandler responded, "I love life too much, and I love my freedom too much . . . to want to put this off for two more months so . . . I don't want that type of delay in my life[.]"

Chandler proceeded to give an opening statement before presenting his own evidence, then testified at length in narrative form about a wide range of topics including his childhood trauma, being persecuted by family members, interactions with law enforcement while living on the street, and various conspiracy theories involving artificial intelligence and hearing voices. The court frequently directed Chandler to focus on the events at issue in the case, and Chandler presented different versions of his interaction with M.B. during his testimony. For example, he said that he approached the truck because he saw M.B. injecting ketamine, he was concerned M.B. might be suffocating, he

11

thought M.B. was committing suicide, he thought there was a pet or a child in the car, and he was actually yelling at Frederick G. because seeing his companion go into traffic sent him into a panic. He also said that he pulled on the truck's door handle to give M.B. some air, and rather than demanding money from M.B., he was yelling to Frederick G. "about what to say to get donations . . . down by the church[.]" In his closing, Chandler repeated portions of his testimony and argued for a mistake-of-fact defense based on an instruction the court gave to the jury.[2]

After four days of trial, the jury found Chandler guilty on all counts and found true that he had been previously convicted of a serious prior felony and was guilty of a strike prior offense. The court sentenced Chandler to a total of 32 months in prison for attempted robbery and the strike prior offense enhancement. For the possession charges, the court sentenced Chandler to 297 days in jail to be served concurrently with the sentence for attempted robbery.

---

[2] The court gave the following instruction:

"The defendant is not guilty of count one if he did not have the intent or mental state required to commit the crime because he did not in good faith know a fact or mistakenly believed a fact. The defendant's knowledge of belief must be in good faith.

"If the defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit the attempt robbery. The defendant must have acted in good faith.

"If you find that the defendant in good faith believed that [M.B.] was in need of medical assistance and/or was in distress requiring intervention, he did not have the specific intent or mental state required for count one.

"If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for an attempt robbery, you must find him not guilty of that crime."

DISCUSSION

I

Chandler contends that the trial court failed to adequately inquire into his competence to represent himself at various points in the proceedings. We disagree. We begin first by addressing whether his initial decision to forego representation was knowingly and intelligently made, then we address whether substantial evidence supports the finding that Chandler was mentally competent to represent himself throughout the proceedings.

*A.* Faretta *Waiver*

Chandler contends that his limited education and apparent misunderstanding of the maximum potential punishment he was facing at the time he waived his right to counsel required the court to inquire into his competence for self-representation. To the extent Chandler is arguing that his waiver was not knowingly, voluntarily, and intelligently made, we are not persuaded.

We review de novo whether Chandler's assertion of the right to self-representation and waiver of the right to counsel was knowing and intelligent. (*People v. Marshall* (1997) 15 Cal.4th 1, 24; *People v. Miranda* (2015) 236 Cal.App.4th 978, 984 (*Miranda*).) In *Faretta*, the United States Supreme Court held that the Sixth Amendment includes a right of self-representation. The court acknowledged "that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." (*Faretta, supra*, 422 U.S. 806 at p. 834.) But "[t]he defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his

13

detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' " (*Ibid*.)

"A knowing and intelligent waiver of the right to counsel is required before a criminal defendant is allowed to represent himself. The defendant should be made aware of the dangers and disadvantages of self-representation so the record shows he is making an informed choice with his eyes wide open. The purpose of this requirement is to determine whether the defendant in fact understands the significance and consequences of his decision and whether that decision is voluntary. On appeal the test is not whether specific warnings or advisements were given. Instead, we examine the record as a whole to determine whether the defendant understood the disadvantages of self-representation, including the risks and complexities of his case." (*Miranda, supra*, 236 Cal.App.4th at p. 984 [cleaned up].)

The record here shows that Chandler was able to complete the *Faretta* waiver form and adequately understood its contents. His attorney stated that he had advised him of the disadvantages of self-representation, and Judge Shelton orally confirmed that Chandler was aware of them. Chandler acknowledged that he understood the significance and consequences of his decision, and he was able to express himself rationally and ask intelligible questions about advisory counsel. He even requested the earliest possible readiness hearing and trial date and sought a bail reduction hearing. When asked why he wanted to represent himself, Chandler said he believed he would be "a more effective person to do it." Chandler's statements to the court and his answers in the *Faretta* form thus communicated an informed desire to represent himself "consistent with a voluntary and intelligent waiver." (*Miranda, supra*, 236 Cal.App.4th at pp. 986–987.)

Chandler contends that he misunderstood the risks of self-representation because he overestimated his maximum possible punishment by 0.5 to 1.5 years in his *Faretta* form. The People note in their brief that Chandler actually underestimated his exposure by several years because he faced a maximum aggregate term of 12.5 years. The People's calculation appears to be the correct one. But even taking into account the fact that Chandler did not know the precise penal risk he faced, we conclude that his misunderstanding was not dispositive considering the totality of the record.

We recognize that Courts of Appeal have disagreed about whether trial courts have an affirmative duty to advise defendants of the maximum punishment in every *Faretta* case. (Compare *People v. Bush* (2017) 7 Cal.App.5th 457, 473 [waiver was valid even though court failed to advise defendant of all possible penal consequences, including substantial monetary fines] and *People v. Fox* (2014) 224 Cal.App.4th 424, 433–438 [trial court's incorrect statement regarding future three strikes consequence of conviction did not vitiate defendant's waiver] with *People v. Jackio* (2015) 236 Cal.App.4th 445, 454–455 [Sixth Amendment requires a trial court to advise a defendant "desiring to represent himself at trial of the maximum punishment that could be imposed if defendant is found guilty of the crimes, with enhancements, alleged at the time the defendant moves to represent himself"]; see also *People v. Ruffin* (2017) 12 Cal.App.5th 536, 544 (*Ruffin*) [declining to enter into debate as to whether trial court is required to advise of possible penal consequences because "even if such an advisement is not mandatory, its total absence is certainly a factor to consider in determining whether the defendant's waiver was knowingly made"].)

We decline to adopt a categorical rule that trial courts are always required to advise *Faretta* defendants of the maximum punishment because

15

such a rule would be inconsistent with United States Supreme Court case law holding that no particular form of warning is required, and that the information a defendant must have will depend on the facts and circumstances of each case. (See *Iowa v. Tovar* (2004) 541 U.S. 77, 92 ["the information a defendant must have to waive counsel intelligently will 'depend, in each case, upon the particular facts and circumstances surrounding that case' "]; *United States v. Ruiz* (2002) 536 U.S. 622, 629 ["[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it."].) It would also run contrary to the California Supreme Court's holdings that no specific warnings or advisements are required for a valid *Faretta* waiver. (See, e.g., *People v. Burgener* (2009) 46 Cal.4th 231, 240–241 [no particular form of warning is required as long as the record as a whole shows that the defendant understood the dangers of self-representation]; *People v. Lawley* (2002) 27 Cal.4th 102, 140 [" ' "The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." ' "].) We acknowledge, however, that a defendant's ignorance of the maximum punishment is at least a relevant factor in assessing whether the waiver was knowingly made. (*Ruffin, supra*, 12 Cal.App.5th at pp. 543–544.)

Based on the totality of circumstances, we conclude that to extent there was error in calculating Chandler's maximum punishment in his *Faretta* form, it was harmless here. Chandler was generally aware that he faced a

16

substantial prison term. Nothing in the record suggests that his decision to represent himself would have changed based on any misunderstanding of his potential exposure, and he consistently expressed his desire to maintain control over his own defense. When the trial court suggested at various times that he could request a continuance to seek counsel or get a psychological evaluation, Chandler's primary concern appeared to be moving forward with trial and avoiding delay. There is no evidence in the record that Chandler's decision to represent himself was related to the length of his potential sentence, at least with respect to the margin of potential error here. Accordingly, considering the record as a whole, we conclude the trial court adequately warned Chandler of the disadvantages of self-representation such that his waiver was knowing, voluntary, and intelligent, notwithstanding his apparent misunderstanding of the maximum possible punishment. (See *Miranda, supra*, 236 Cal.App.4th at p. 987; see also *Faretta, supra*, 422 U.S. at pp. 835–836 [defendant's waiver voluntary where the record affirmatively showed he "was literate, competent, and understanding" and trial judge had "warned [him] that he thought it was a mistake not to accept the assistance of counsel, and that [he] would be required to follow all the 'ground rules' of trial procedure"].)

## B. *Mental Competence for Self-Representation*

Having concluded Chandler's initial waiver was valid, we analyze next whether substantial evidence supports the court's determination that he was competent to represent himself. (*People v. Johnson* (2012) 53 Cal.4th 519, 531 (*Johnson*).)

In *Edwards*, the United States Supreme Court considered whether the Constitution permits a state to deny the right of self-representation to a "gray-area defendant" who is mentally competent to stand trial but lacks the

17

mental capacity to conduct his own defense without counsel.  (*Edwards, supra*, 554 U.S. at pp. 173–174.)  The court held that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."  (*Id.* at p. 178.)  The court declined to adopt "a more specific standard that would 'deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury.' "  (*Ibid.*)

In *Johnson, supra*, 53 Cal.4th 519, the California Supreme Court considered whether our state courts may deny self-representation in the circumstances permitted by *Edwards*.  (*Johnson*, at pp. 526–531.)  The court held "that trial courts may deny self-representation in those cases where *Edwards* permits such denial."  (*Id.* at p. 528.)  But the court emphasized that "what is permissible is only what *Edwards* permits . . . ."  (*Id.* at p. 530.)  Consistent with *Edwards*, "the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel."  (*Ibid.*)

The *Johnson* court further explained: "A trial court need not routinely inquire into the mental competence of a defendant seeking self-representation.  It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Johnson, supra*, 53 Cal.4th at p. 530.)  "[W]hen it doubts the defendant's mental competence for self-representation, it may order a psychological or psychiatric examination to inquire into that question.  To minimize the risk

18

of improperly denying self-representation to a competent defendant, 'trial courts should be cautious about making an incompetence finding without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' " (*Id*. at pp. 530–531, italics omitted.)

Finally, the *Johnson* court emphasized that "[t]rial courts must apply this standard cautiously." (*Johnson, supra*, 53 Cal.4th at p. 531.) "Criminal defendants still generally have a Sixth Amendment right to represent themselves. Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides. Rather, it may deny self-representation only in those situations where *Edwards* permits it." (*Ibid*.)

Applying *Edwards* and *Johnson* here, we conclude that substantial evidence supports the trial court's determination that Chandler was sufficiently mentally competent to represent himself. To start, *Edwards* and *Johnson* both require that the defendant's incompetence to represent himself derive from a "severe mental illness." (*Edwards, supra*, 554 U.S. at p. 178; *Johnson, supra*, 53 Cal.4th at p. 530.) At no point in the proceedings did the record before the trial court compel a finding that Chandler suffered from a *severe* mental illness. There was no expert testimony and no medical documentation on the subject, and although the record indicates that Chandler suffers to *some* extent from mental health issues, substantial evidence supports the court's determination that he could perform "the basic

19

tasks needed" to present a defense without the help of counsel. (*Johnson, supra*, 53 Cal.4th at p. 530.)

For example, Chandler effectively requested to subpoena defense witnesses. His plea negotiations at readiness and settlement conferences demonstrated his appreciation for the nature of the proceedings and potential outcomes. He cross-examined the People's witnesses, elicited relevant testimony, and testified in his own defense as to a variety of legal theories. He showed that he had done legal research to support his arguments at various points in the proceedings, and had at least one of his objections sustained. Although Judge Thompson frequently had to instruct Chandler to rephrase his questions, he was responsive enough to the court's directives to present evidence in support of his various defense theories. During the instruction conference, the court found sufficient evidence to give a mistake of fact instruction tailored to Chandler's testimony. Chandler also argued coherently—albeit unsuccessfully—for including instructions on other defenses including necessity, duress, diminished capacity, and involuntary intoxication.

This is not to say that Chandler's self-representation was adept. He submitted several unsuccessful or inapplicable motions and filings, procured no expert testimony or documentation regarding mental illness, and presented multiple contradictory and unpersuasive versions of events in his testimony. But the quality of Chandler's legal acumen was not such that the court was compelled to hold a competency hearing, especially given that courts are to be "cautious" in deciding whether to inquire into a self-represented defendant's competence. (*Johnson, supra*, 53 Cal.4th at pp. 530–531.)

Chandler contends that the court was nonetheless obligated to inquire into his mental competency to represent himself because the downtown court expressed doubts about his competency, he made several requests for advisory counsel, OAC denied his motions because they were "confusing and incoherent," and Chandler made multiple references to obtaining a psychological evaluation. We disagree.

First, Judge Shelton did take into consideration the downtown proceeding and specifically continued Chandler's readiness hearing to gather more information about the section 1368 examination. Judge Shelton, who had granted Chandler's request for self-representation at a previous hearing, observed on the record that Chandler appeared to be "alert and responsive." Chandler himself explained that he was still adjusting to new medication at the downtown hearing, but that he was "feeling better today." In these circumstances, it was reasonable for Judge Shelton to continue the hearing and await further developments in the downtown case based on his own observations of Chandler's demeanor in court. (See *Johnson, supra*, 53 Cal.4th at p. 531 [deference to a trial court's competence determination "is especially appropriate when . . . the same judge has observed the defendant on numerous occasions."].) Moreover, although the evaluation findings are not in the record, at a subsequent hearing that happened after the scheduled examination date, the prosecutor informed Judge Cookson that Chandler was representing himself in the downtown case. We can thus infer from the record that he was deemed competent in the downtown case after the section 1368 hearing, which also supports the court's decision not to inquire further into his competency.

As for Chandler's requests for advisory counsel and the fact that OAC deemed his motions "confusing and incoherent," we conclude that considering

21

the record as a whole, those circumstances also did not require the court to inquire into his competence. While Chandler did make multiple requests for advisory counsel, the requests themselves were not indicative of a severe mental illness that would prevent him from presenting a defense without counsel. Each request was prompted by either the court's inquiries into his desire to continue representing himself, delays with OAC, or Chandler's desire to *supplement* his own representation. Although he made references to having attention deficit disorder, at no point in making his requests did Chandler indicate he needed advisory counsel because he had a *severe* mental illness that prevented him from performing the tasks necessary for a defense. Moreover, while Chandler's motions may have been confusing, Judge Cookson found several of Chandler's motions to be coherent enough to rule on them, as did Judge Thompson. The fact that the motions were difficult to understand, or inaptly written, does not necessarily implicate the existence of a severe mental illness warranting an inquiry into Chandler's competence. (See *People v. Weber* (2013) 217 Cal.App.4th 1041, 1060 ["The fact a defendant does a bad job, or even fails to contest the case, is not a basis to revoke self-representation."]; see also *People v. Best* (2020) 49 Cal.App.5th 747, 757–758 [defendant was entitled to represent herself even though she misunderstood concepts regarding speedy trial rights, statutes pertinent to her offenses, posttrial motions, general versus specific intent crimes, and questions from the court regarding her right not to testify at trial].)

Nor did Chandler's references to wanting a psychological evaluation necessitate further inquiry. The record shows that when Chandler raised the issue of getting evaluated, he was focused on his mental state *at the time of the offense*, not his present competence. During the motions in limine hearing before Judge Thompson, Chandler informed the court that he "was

hoping to get a doctor to speak for [him]" at trial to help him "testify about intimate partner battery and idiocy." Later in the same hearing, the prosecutor requested that Chandler either call a medical expert at trial or be precluded from providing a lay opinion about his mental health or hearing voices. When Judge Thompson suggested that Chandler "should be requesting a continuance" if he wanted to have a psychological evaluation done, Chandler declined to do so because he wanted to avoid delays. Not only was Chandler cogent enough to make a decision after considering the disadvantages of requesting an evaluation, but there is also no evidence in the record that an evaluation would have revealed he presently suffered from a mental illness so severe that it would raise a doubt as to his competence. (See *People v. Ghobrial* (2018) 5 Cal.5th 250, 271 ["[E]vidence of mental illness alone is not sufficient to raise a doubt about a defendant's competence to stand trial."]; *People v. Johnson* (2018) 6 Cal.5th 541, 552, 578 [expert testimony that the "defendant suffered some from psychosis with 'some kind of a thinking disorder'" did not obligate the trial court to conduct a competency hearing].) Indeed, the fact that he was deemed competent to represent himself in the downtown proceeding supports the opposite conclusion.

We acknowledge that Chandler seemed to suffer from mental health challenges—whether it was attention deficit disorder, or another condition that would explain his tangential thinking or hearing voices—that made his self-representation difficult and less effective. The strict standard imposed by *Edwards* and *Johnson*, however, requires the existence of a severe mental illness that prevents a defendant from performing the basic tasks necessary for presenting a defense. (*Johnson, supra*, 53 Cal.4th at p. 530.) In the absence of sufficient evidence showing Chandler had such an illness or could

23

not perform these tasks, we conclude that substantial evidence supports the trial court's determination that a psychological evaluation was unnecessary and that Chandler was mentally competent to represent himself.

II

Chandler contends that the court abused its discretion in denying Chandler's requests for advisory counsel. Again, we disagree.

In capital cases at least, "California courts have discretion to appoint advisory counsel to assist an indigent defendant who elects self-representation. When a defendant requests appointment of advisory counsel, a court's failure to exercise its discretion is serious error and its denial of a request for advisory counsel in a capital case may constitute an abuse of discretion. Failure to exercise discretion on a request for advisory counsel in circumstances where a refusal to grant the request would be an abuse of discretion requires automatic reversal of a resulting conviction because of the inherent difficulty in assessing prejudice. If the failure to appoint counsel would not be an abuse of discretion, the consequences of the error are properly assessed by employing the *Watson* harmless error standard." (*People v. Morelos* (2022) 13 Cal.5th 722, 738 (*Morelos*) [cleaned up], citing *People v. Crandell* (1988) 46 Cal.3d 833, 861 (*Crandell*) and *People v. Bigelow* (1984) 37 Cal.3d 731, 742–746 (*Bigelow*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

We acknowledge that our court previously declined to extend *Bigelow*'s reasoning regarding advisory counsel to a non-capital case. (See *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1429.) Because it is unnecessary for us to decide the question, we will nevertheless assume without deciding that the reasoning in *Bigelow*, *Crandell*, and *Morelos* applies here.

24

"A defendant seeking appointment of advisory counsel must make a showing of need and the decision to grant or deny the request rests in the sound discretion of the trial court. We determine on a case-by-case basis whether denial of a request for advisory counsel would have been an abuse of discretion. As long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside." (*Morelos, supra*, 13 Cal.5th at p. 739 [cleaned up].) "We have previously described the factors a court may consider in exercising its discretion on a motion for advisory counsel. These encompass defendant's reasons for seeking advisory counsel, defendant's background, education, and demonstrated legal abilities, and the complexity of the issues involved." (*Ibid.*, citing *Crandell, supra*, 46 Cal.3d at p. 863.)

Chandler identifies five occasions when his request for advisory counsel was denied. With two exceptions, which we discuss further below, the record here does not indicate that the trial court either failed to exercise its discretion or concluded that it lacked discretion to grant such a request if it so chose. (See *People v. DeJesus* (1995) 38 Cal.App.4th 1, 29 [no presumption that the trial court failed to perceive its authority to modify sentence, and court need not affirmatively acknowledge its discretion].) The first three times the court denied Chandler's requests for advisory counsel, Judge Shelton demonstrated that he believed he *could* grant the requests by stating that the request was "allowed," or that he was declining to grant the request "at this time," rather than declining to entertain the requests at all or making a blanket statement akin to saying "there is no such thing" as advisory counsel (*Crandell, supra*, 46 Cal.3d at p. 857).

At one point during a hearing on motions in limine, however, Judge Thompson responded to Chandler's request for "advisory or a co-counsel or

side counsel" by saying, "Can't do that." Then during trial, when the parties were discussing jury instructions, Chandler asked if he could request a public defender's assistance in arguing for certain instructions. Judge Thompson replied, "No, no, no. You made your determination that you were going to represent yourself. I'm not so sure that I could appoint a Public Defender at this time to represent you for that purpose only." Judge Thompson later clarified that if Chandler was "making a motion to have counsel now appointed to represent you and forfeiting [his] pro per status," then he could make that motion.

Based on our assumption that the capital cases on advisory counsel apply to noncapital cases, Chandler arguably *could* request advisory counsel to assist him with preparing to represent *himself* in the instruction conference. (Cf. *Morelos, supra*, 13 Cal.5th at pp. 738–739 [assuming without deciding that trial court "erroneously failed to recognize its discretion" to grant defendant's request for advisory counsel where the trial judge stated, "probably I don't have the ability to comply with your request"].) In capital cases, the California Supreme Court has recognized a form of hybrid representation where an advising attorney " 'actively assists the defendant in preparing the defense case by performing tasks and providing advice pursuant to the defendant's requests, but does not participate on behalf of the defense in court proceedings.' " (*People v. Miracle* (2018) 6 Cal.5th 318, 338, quoting *People v. Moore* (2011) 51 Cal.4th. 1104, 1119, fn. 7.) Under these cases, a court could assign advisory counsel to assist a defendant with preparing arguments in an instruction conference without compromising his " 'right to present his case in his own way.' " (*Miracle*, at p. 338, quoting *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14.)

Assuming the court may have failed to exercise its discretion on Chandler's requests for advisory counsel in these two instances, we must still decide whether denying the requests would have been an abuse of discretion subject to per se reversal or, if not, an error subject to reversal under the *Watson* standard. (*Morelos, supra*, 13 Cal.5th at p. 738.) We conclude that denying those requests would not have been an abuse of discretion. The record shows that Chandler had completed one year at a university and was familiar with the jail law library. (Cf. *Morelos*, at p. 739 [no abuse of discretion where defendant was not a foreign national, attended high school and one year of community college, took a business course in prison, and made frequent use of the law library].) He prepared and submitted numerous legal filings before trial, made detailed plea offers on his own behalf, and made intelligible arguments for specific defenses. Moreover, in the two instances at issue, Chandler requested advisory counsel the day before and during trial. Granting those requests would likely have necessitated a delay in the proceedings. (See *id*. at p. 739.) Considering all these factors, assuming the court failed to exercise its discretion, we conclude it would not have been an abuse of discretion for the trial court to deny his requests. Thus, the deprivation of advisory counsel was not subject to a per se reversal standard.

For similar reasons, Chandler fails to establish prejudice from the denial of his requests under *Watson*, which requires us to determine whether it is "reasonably probable that different verdicts would have been returned had defendant received the assistance of advisory counsel." (*Crandell, supra*, 46 Cal.3d at p. 866.) When he requested advisory counsel during the motions in limine hearing, he did so in response to the trial court's general inquiry about whether he still wanted to proceed pro per. He did not specify what he

27

sought to accomplish by requesting advisory counsel, so it is unclear how he would have used advisory counsel, or how such counsel might have impacted the verdict. His other request during trial had to do with arguing for certain jury instructions. But he makes no argument on appeal that there were instructions warranted by the evidence that were not given to the jury, and as noted, the court obliged him in giving a mistake-of-fact instruction tailored to his testimony. On this record, it is not reasonably probable that different verdicts would have been returned had Chandler received assistance in preparing for the instruction conference.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.

28