Filed 9/4/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B335646 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. PA087919 |
| v. | |
| RICARDO SARABIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri G. Merritt, Judge. Affirmed and remanded with instructions.

Levine, Flier & Flier, Andrew Flier, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After the trial court excluded gang evidence, the court told the prosecutor that, when in the presence of the jury, the word "nickname" would be better than "moniker." The court's advice

was sound.  We affirm the judgment.  We remand to correct a detail in the abstract of judgment.

I

Ricardo Sarabia shot three people.  Two were the brothers German and Ramon Servin.  We refer to them by first name.

The third was Domenica Romero, who had been friends with German since middle school.  On December 23, 2016, she visited German at Ramon's place.  Ramon lived in a converted garage, with a bathroom and shower in a small separate building.

Romero arrived to find German but not Ramon.  German introduced his companion as Clover.  The jury learned Clover was a nickname for Sarabia.

Sarabia was well armed.  Romero saw one gun near Sarabia's chest, another in his back pocket, and ammunition magazines in other pockets.

Romero sat on the bed doing her makeup and getting high on methamphetamines.

Ramon arrived.

Sarabia asked Ramon where Sarabia's phone was.

Ramon said, "What phone?"

Ramon and German went outside to argue.

Sarabia joined the brothers outside.  Sarabia insisted Ramon return his car keys, his phone, and his pistol.

Ramon said he did not have the keys.

German told Ramon to give Sarabia his phone back.

Ramon claimed he lost both Sarabia's phone and gun.

German came inside, grabbed a gun, and told Romero to sit there while they took care of something.

Romero could see German and Ramon through the open door.  She could hear all three men.

2

Ramon entered the bathroom building and prepared to shower:  he took off his clothes and turned on the water.

Sarabia kept asking about his phone and gun.

Through the door, Ramon repeated he did not have the phone or the gun.

Sarabia started shooting at Ramon through the bathroom door.

Sarabia turned and began firing at German, who crumpled to the ground.  Sarabia walked over and shot German two more times.

Sarabia fired more shots through the door at Ramon.

Romero ran to a closet.  She hid behind the curtain that served as the closet door.

Sarabia called to her, "Where are you, bitch?"

Sarabia shot through the curtain into the closet, hitting Romero in the stomach.  Despite her wound, Romero kept quiet. She heard Sarabia rustling among things in the room.

When Sarabia left, Romero called 911.

Officers found German dead in a pool of blood.

The officers heard the shower running.  They tried to open the door, but it was blocked.  Forcing their way in, they found Ramon in a deathlike pose.  Paramedics later saved Ramon.

At the hospital, officers spoke to Ramon and Romero.  Both identified "Clover" as the shooter.

Ramon selected Sarabia from pictures officers showed him.  About a week later, Romero made the same identification.

Two months later, police arrested Sarabia in Arizona.  They searched Sarabia's mobile phone and found photos and information.

At the preliminary hearing, Ramon changed his story.  He testified he sent a letter to defense counsel saying he did not know who Sarabia was.  Ramon claimed he did not know about Sarabia or Clover, nor did he know who shot him.

During pre-trial conferences, Sarabia's counsel would not stipulate to the foundation for photos police got from Sarabia's cell phone in Arizona.  The prosecutor expressed surprise, saying he thought defense counsel would stipulate.  The trial court found there had been miscommunication and allowed a short delay to bring the Arizona police to court to lay the foundation.  When the prosecutor spoke with Arizona officers about coming to testify, they mentioned, for the first time, they also had photos of Sarabia's Arizona residence, which they sent.  The prosecutor swiftly gave copies to defense counsel.

In limine, the court excluded gang evidence and ordered each side to tell their witnesses about this order.  An officer for the prosecution, however, testified Clover was Sarabia's "moniker."  Without the jury present, the court told the officer to use the term "nickname."  Sarabia moved for a mistrial, which the court denied.

Outside the presence of the jury, Ramon asserted his Fifth Amendment right to remain silent.  The court ruled Ramon was unavailable and allowed into evidence Ramon's testimony from the preliminary hearing.

The jury convicted Sarabia of the first degree murder of German, the first degree attempted murders of Ramon and Romero, dissuasion of a witness with respect to Romero, and being a felon in possession of a firearm.  The jury found Sarabia personally and intentionally discharged a firearm resulting in

4

great bodily injury or death.  The trial court sentenced Sarabia to 90 years to life.

## II

Sarabia asserts nine trial court errors.  We affirm.

## A

Sarabia argues the trial court erred in denying his motion for a mistrial after the prosecutor's witness used the term "moniker."  The court ruling was correct.

After granting the defense motion in limine to exclude gang evidence, the court ordered the attorneys to inform their witnesses of this ruling and to ensure they abided by it.

When prosecution witness Captain Sal Petrelli testified, however, he told the jury Romero knew Sarabia only by "Clover," which Petrelli said was Sarabia's "moniker."

At a sidebar, the court warned the prosecutor that this testimony was entering a minefield and asked whether the prosecutor had warned the officer.  The prosecutor said he had not had a chance to do so.

The court was understandably concerned that the prosecutor failed to admonish the witness.  It nevertheless denied the motion for mistrial.  It also advised counsel that "nickname" would have been a better word for the officer to use.

One instance of the word "moniker" did not deny Sarabia a fair trial.  People working in the criminal justice system may connect the word "moniker" with gangs from familiarity with rap sheets (which can have an entry labeled "moniker").  Sarabia has not established the lay population, from which the jury pool is drawn, shares this association.  A standard dictionary defines the word as slang for "a person's name, esp. a nickname or alias." (The Random House Dictionary of the English Language (2d ed.

5

1987) p. 1242; see also Webster's New Collegiate Dictionary (1976) p. 743 ["NAME; NICKNAME"]; The American Heritage Dictionary (2d College ed. 1982) p. 810 ["A personal name or nickname"].)

The prosecution quotes this dictionary definition: "Merriam-Webster's dictionary defines moniker as 'NAME, NICKNAME,' and gives as an example, ' 'Hoosier' is a common *moniker* for a resident of Indiana.' (Https://www.merriamwebster .com/dictionary/moniker?src=search-dict-box.)"

The court was right to deny the mistrial motion.

## B

Sarabia argues the trial court improperly admitted hearsay evidence from Ramon and Romero. We do not pursue this point, for Sarabia has not engaged the trial court's reasoning for admitting the evidence. (*People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised"].)

After Ramon asserted his Fifth Amendment right, the trial court ruled that Ramon was unavailable. The court admitted Ramon's testimony from the preliminary hearing, a proceeding at which Sarabia called Ramon and had the chance to question him. Sarabia suggests no basis for challenging these rulings.

During trial, Romero's testimony was inconsistent with her earlier testimony and interview statements. The trial court allowed the prosecutor to impeach Romero with her prior inconsistent statements. Sarabia suggests no reasoned challenge to this ruling either.

These unsupported attacks fail.

## C

Sarabia erroneously argues the trial court should have excluded two sets of photos because the prosecution violated its discovery obligations.

The first set of photos came from Sarabia's phone, which officers obtained when they arrested him in Arizona. Police did not snap the shutter to record these images. The prosecutor represented to the court that he had produced these photos to Sarabia early in the discovery process. Sarabia's trial counsel did not claim otherwise. On appeal, Sarabia has no basis for challenging the phone photos. There was no discovery malfeasance.

The second set consisted of photos police took when arresting Sarabia in Arizona. They showed Sarabia had decorated his place with a clover motif. Clover images appeared on his pillows and bedding. There were clover stickers and wooden cutouts of clovers. Sarabia's attorney said he had not seen these photos, which the prosecutor produced shortly before trial. The prosecutor learned of these pictures only on the eve of trial and immediately sent them to defense counsel. The prosecution's speedy response to an unexpected discovery was proper.

D

Sarabia argues the trial court erred in refusing to give a heat of passion voluntary manslaughter instruction. This argument is incorrect.

A trial court must give a lesser included instruction only where there is sufficient evidence that, if accepted by the trier of fact, would absolve a defendant of the greater offense but not the lesser. (*People v. Whalen* (2013) 56 Cal.4th 1, 68.)

7

Sarabia argued that his frustration over Ramon not returning his cell phone, keys, and gun could support the heat of passion instruction. As the trial court noted, the heat-of-passion doctrine applies only where an objective person's passions would be aroused. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000–1001.) Sarabia's scenario did not meet this threshold. (*People v. McShane* (2019) 36 Cal.App.5th 245, 256 [provocation must be more than "mundane annoyances"].) The trial court correctly refused this instruction.

E

Sarabia argues the trial court erred in denying his mid-trial motions invoking *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) and *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

During the fourth day of trial, Sarabia said he wanted to read a letter to the court. The court said to speak with his attorney, but Sarabia refused. After speaking with counsel, the court allowed Sarabia to read his letter. Sarabia asserted his attorney had told Sarabia he was going to lose his case, and he must seek a mistrial by attacking his attorney. Based on this, Sarabia claimed the attorney-client relationship had broken down, and he wanted to fire his attorney.

The attorney said, as an officer of the court, Sarabia's accusations were false. The court denied Sarabia's motion as untimely. (*People v. Maciel* (2013) 57 Cal.4th 482, 512 [court properly denies untimely *Marsden* motion].) We review a trial court's denial of a *Marsden* motion for abuse of discretion. (*Ibid.*) No abuse occurred here. The trial court was entitled to credit defense counsel. Any substitution of counsel probably would have required a new trial.

8

The next day, Sarabia told the court he wished to represent himself, again citing his accusations against his attorney for a breakdown in the relationship. He told the judge he would need stand-by counsel. The court told Sarabia it would not continue the case nor was Sarabia entitled to stand-by counsel, who would be unfamiliar with the case. As the court told Sarabia, the right to represent oneself is subject to limitations. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 425 (*Buenrostro*).) One is whether the party's motion is timely. (*People v. Lynch* (2010) 50 Cal.4th 693, 722.) The court did not abuse its discretion by ruling Sarabia's mid-trial motion was untimely. (*Buenrostro*, *supra*, 6 Cal.5th at p. 426.)

The waiver of the right to counsel must also be knowing. (*People v. Miranda* (2015) 236 Cal.App.4th 978, 984.) Sarabia admitted, "Well, I really don't understand what I'm doing." The trial court was entitled to take him at his word.

Sarabia complains the court gave him only 25 minutes to consider the *Faretta* waiver. This was reasonable under the circumstances. The parties were in the middle of a jury trial. Jurors were waiting. The court was entitled to disbelieve Sarabia's accusations against his attorney. Sarabia was unprepared to take over his trial himself without help or a continuance, neither of which the court could provide without disrupting the trial.

Sarabia's attorney represented that his relationship with Sarabia remained good through the end of trial. They exchanged notes and worked on the case together, as before.

The court did not abuse its discretion by denying Sarabia's *Marsden* and *Faretta* motions.

9

## F

Sarabia argues the trial court erred by allowing into evidence a call he made to his sister from jail. The court's ruling was proper.

Sarabia asserts the evidence was more prejudicial than probative because it revealed he was in jail and it contained a lot of swearing. In the call, Sarabia asks his sister to send a message to someone from him and to sign that the message was from "Clover." This, as the trial court noted, was relevant. It was evidence Sarabia's nickname indeed was Clover.

The prejudice was minimal. The jury knew police arrested Sarabia, so they presumed he spent some time in custody. The swearing, while perhaps offensive to some, was not likely to lead a jury to conclude Sarabia was a murderer. As the trial court noted, jurors probably knew many people who swore but who were not murderers.

The evidence was very probative and minimally prejudicial. The trial court ruling was sound.

## G

Sarabia argues there was insufficient evidence to sustain a conviction in the first degree for murder or attempted murder. The evidence was sufficient.

We consider the record in the light favorable to the judgment and determine if there is reasonable evidence to support a finding beyond a reasonable doubt. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068–1069 (*Mendoza*).) We do not reweigh evidence or make credibility determinations. (*Ibid*.)

Sarabia argues there was no evidence he carefully considered whether to kill. Rather, he asserts his "decision was clearly rash and on an impulse and without consideration."

10

Sufficient evidence supported the first degree findings.

Sarabia came armed and gloved. When German crumpled after the first few shots, Sarabia walked toward him and shot him twice more. (*People v. Potts* (2019) 6 Cal.5th 1012, 1029 [continuing violent attack undermines theory of a fit of rage]). The reasonable inference was that the final bullets were kill shots.

After the first murder, Sarabia chose to kill everyone else on the scene.

Bullet holes in the bottom of the bathroom door support the inference that Sarabia, after hearing Ramon fall to the ground, fired downward shots to make sure Ramon was dead.

Sarabia then searched for Romero: "Where are you, bitch?" He found the one place she could be hiding and fired multiple shots into that small space. Sarabia had time to consider the consequences of his actions during this sequence of events. (See *People v. Stitely* (2005) 35 Cal.4th 514, 544.) Sarabia's actions showed his plan was to eliminate witnesses.

H

Sarabia attacks the sufficiency of the evidence supporting his conviction for dissuading a witness.

We apply the same standard as before. (*Mendoza, supra*, 52 Cal.4th at pp. 1068–1069.)

The prosecutor argued Sarabia shot Romero to eliminate a witness. Sarabia says no evidence supports this theory because shooting Romero "was almost an afterthought." The evidence counters Sarabia's suggestion. After shooting German and Ramon, Sarabia entered the room as he said, "Where are you, bitch?" Sarabia had known Romero for less than an hour. She was not involved in the dispute between Sarabia and the Servin

11

brothers.  Her only connection was as a witness to Sarabia's shooting.  These facts support the inference Sarabia searched for Romero to silence a witness.

I

Sarabia challenges the trial court's decision to impose consecutive sentences on the grounds that the trial court did not provide an explanation and was unaware of its discretionary authority under Penal Code section 669.  The trial court sentencing was proper.

As the prosecutor points out, Sarabia forfeited his complaint that the trial court failed to give an explanation by failing to ask for one.  (*People v. Scott* (1994) 9 Cal.4th 331, 352–353 [defendant cannot argue for first time on appeal that court failed to state reasons for sentencing decision].)

We assume a trial court knows and follows the law.  (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)  Sarabia offers no reason to depart from that assumption.

J

Sarabia argues that, if errors separately were harmless, cumulatively they establish prejudice.  There were no errors.

III

The prosecutor points out two errors in the abstract of judgment: 1) the form reflects Sarabia's sentence as 95 instead of 90 years to life; and 2) the form shows zero days custody credit. We remand for the trial court to correct the sentence and to calculate Sarabia's custody credits.

12

**DISPOSITION**

We affirm and remand for the trial court to correct the abstract of judgment.

WILEY, J.

We concur:

STRATTON, P. J.

RUBIN, J.*

---

* Retired Presiding Justice of the Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.